## NORTH AMERICAN COMPANY *v.* SECURITIES & EXCHANGE COMMISSION.

No. 1. Argued November 15, 1945.—Decided April 1, 1946.

688

*Charles E. Hughes, Jr.* argued the cause and filed a brief for petitioner.

*Solicitor General McGrath* and *Paul A. Freund* argued the cause for respondent. With *Mr. Freund* on the brief were *Solicitor General Fahy, John F. Davis, Milton V. Freeman, Roger S. Foster* and *David K. Kadane.*

*Arthur A. Ballantine, John F. MacLane, Wilkie Bushby* and *Joseph Schreiber* filed a brief, as *amici curiae,* in support of petitioner.

MR. JUSTICE MURPHY delivered the opinion of the Court.

Congress enacted the Public Utility Holding Company Act of 1935, 49 Stat. 803, in order to correct grave abuses which it had found in the use of the holding company device in the nation's electric and gas utility industries. This Court in *Electric Bond & Share Co.* v. *Securities & Exchange Commission,* 303 U. S. 419, held constitutional the various provisions of the Act relating to the registration of holding companies as therein defined. In this case we are called upon to determine the constitutionality of § 11 (b) (1) of the Act, authorizing the Securities and Exchange Commission to act to bring about the geographic and economic integration of holding company systems. Specifically, we must decide whether this requirement falls within the power of Congress to regulate commerce among

the several states and whether it violates the due process clause of the Fifth Amendment.

The North American Company, the petitioner, is a holding company within the meaning of the Act, § 2 (a) (7), and is registered as such with the Securities and Exchange Commission.[1] The Commission instituted appropriate administrative proceedings against North American under § 11 (b) (1), the provisions of which apply to registered holding companies. As a result, the Commission entered orders limiting North American's properties to those which, in the Commission's judgment, complied with the standards of § 11 (b) (1) and compelling it to sever relationships with all its other properties.[2] The court below, after affirming the orders of the Commission on a statutory level, rejected North American's constitutional objections. 133 F. 2d 148. Only these constitutional issues are now before us.

As was the situation in the *Electric Bond & Share Co.* case, North American is clearly engaged in activities which bring it within the ambit of congressional authority. North American is a typical utility holding company. It is the pinnacle of a great pyramid of corporations, the majority of which operate electric and gas utility properties. These properties are scattered throughout the United States, many of them serving large cities and contiguous territories.[3] Electric energy is transmitted across state lines by numerous companies in the pyramid or

---

[1] North American registered with the Commission on February 25, 1937, reserving its right to challenge the constitutionality of § 11 (b) (1) and other portions of the Act. See *Landis* v. *North American Co.*, 299 U. S. 248, 251–252; *Electric Bond & Share Co.* v. *Securities & Exchange Commission*, 303 U. S. 419, 435.

[2] Holding Company Act Releases Nos. 3405 and 3629. [See 11 S. E. C. 194; 11 S. E. C. 715.]

[3] Federal Trade Commission Report to the Senate, "Utility Corporations," Sen. Doc. 92, Part 72–A, 70th Cong., 1st Sess., pp. 107–110, 706–716.

system.[4] As of December 31, 1940, there were some eighty corporations in the system, with an aggregate capitalized value in excess of $2,300,000,000. Organized in New Jersey in 1890 and maintaining business headquarters in New York City, North American maintains direct or indirect interests in these corporations through the medium of stock ownership. It is that medium that binds the system together.

North American owns stock directly in ten of the corporations, holding 79% or more of the common stock of eight of them and 17.71% and 19.2%, respectively, of the voting securities of the other two. Three of these direct subsidiaries are registered holding companies: (1) Union Electric Company of Missouri, operating in and around St. Louis, Mo., and with subsidiaries operating in Illinois and Iowa as well; (2) Washington Railway and Electric Company, with subsidiaries operating in the District of Columbia and adjacent territory in Virginia and Maryland; and (3) North American Light & Power Company, operating extensive systems in Kansas, Missouri, Illinois and Iowa in addition to being the parent of several registered holding companies.

Four of the direct subsidiaries of North American are operating companies: (1) Cleveland Electric Illuminating Company, serving Cleveland, Ohio, and surrounding territory; (2) Pacific Gas & Electric Company, serving large areas in California; (3) The Detroit Edison Company, serving Detroit and vicinity; and (4) Wisconsin Electric Power Company, a holding company with subsidiaries operating an integrated electric utility system in Wisconsin and Michigan.

---

[4] In 1929 and 1930, companies in the North American system transmitted 9.3% and 7.7%, respectively, of the total amount of electric energy transmitted across state boundaries in the United States. Federal Trade Commission Report, *supra*, note 3, p. 43, Table 13.

The other three direct subsidiaries are (1) North American Utilities Securities Corporation, an investment trust; (2) West Kentucky Coal Company, which owns and operates a coal mine in Kentucky and sells coal in interstate commerce; and (3) 60 Broadway Building Corporation, which owns the office building in New York City where petitioner has its offices.

The various companies in the North American system perform a variety of functions from electric and gas service to railroad transportation, warehousing and amusement park operations. All told, they conduct business in seventeen states and the District of Columbia. Electric service alone is provided for more than 3,000,000 customers in an area of roughly 165,000 square miles.

North American claims that its sole and continuous business has been that of acquiring and holding for investment purposes stocks and other securities of the subsidiaries, its relationship being essentially that of "a large investor seeking to promote the sound development of his investment." Active intervention on North American's part in the activities of these companies, it is true, has been of a limited character. Operations and operational policies, the Commission found, have been left entirely to the local managements. Nor has North American sold these subsidiaries any supplies or engineering service. This lack of active intervention, however, is indecisive. It appears to have resulted in large part from North American's satisfaction with the local managements of the subsidiaries and from the fact that the local managements have often included men selected by or historically related to North American. See *Detroit Edison Co. v. Securities & Exchange Commission*, 119 F. 2d 730, 734–735; *Pacific Gas & Electric Co. v. Securities & Exchange Commission*, 127 F. 2d 378, 383–384. The Commission was thus warranted in considering the harmonization of local policies with those of North American as a fact, the

absence of conflicts making affirmative action by North American unnecessary. But it does not follow that North American's domination of its system was any less real or effective. Historical ties and associations, combined with strategic holdings of stock, can on occasion serve as a potent substitute for the more obvious modes of control. See *Southern Pacific Co.* v. *Bogert,* 250 U. S. 483, 491–492; *Natural Gas Co.* v. *Slattery,* 302 U. S. 300, 307–308. Domination may spring as readily from subtle or unexercised power as from arbitrary imposition of command. To conclude otherwise is to ignore the realities of intercorporate relationships. *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 145–146. In light of the extensiveness of North American's holdings of the securities of its subsidiaries and the penetration of local managements with men of North American background, the Commission was justified in treating North American as possessing domination over its subsidiaries or the power to dominate them when and if necessary.[5]

But North American in some respects has actually intervened in the activities of its subsidiaries. It has affirmatively participated in and dominated their financing operations.[6] So completely has it taken over the planning and handling of the various flotations of securities that North American urged before the Commission, though in vain, that the subsidiaries were incompetent to handle

---

[5] As to only two of the subsidiaries, the Detroit Edison Company and the Pacific Gas & Electric Company, has a claim been raised that they were not controlled by or subject to a controlling influence of North American. The Commission rejected both claims after hearings and its determinations were sustained upon appeal. *Detroit Edison Co.* v. *Securities & Exchange Commission,* 119 F. 2d 730, cert. denied, 314 U. S. 618; *Pacific Gas & Electric Co.* v. *Securities & Exchange Commission,* 127 F. 2d 378, affirmed on rehearing by equally divided court, 139 F. 2d 298, affirmed by equally divided Court, 324 U. S. 826.

[6] See Federal Trade Commission Report, *supra,* note 3, p. 347.

such matters and that it would be highly uneconomical for them to attempt to do so. As the Commission noted, the ability to dominate this financing and to control the flow, through underwriting channels, of millions of dollars of securities has been of great value and benefit to North American, in addition to being of aid to the subsidiaries. North American has also provided the subsidiaries with advisory and consultative facilities in relation to management problems; and intercompany committees have been created to serve as clearing houses for technical and accounting information.

The interstate character of North American and its subsidiaries is readily apparent from the Commission's survey of their activities. North American is more than a mere investor in its subsidiaries. See *Northern Securities Co.* v. *United States,* 193 U. S. 197, 353–354. It is the nucleus of a far-flung empire of corporations extending from New York to California and covering seventeen states and the District of Columbia. Its influence and domination permeate the entire system and frequently evidence themselves in affirmative ways. The mails and the instrumentalities of interstate commerce are vital to the functioning of this system. They have more than a casual or incidental relationship. Cf. *Ware & Leland* v. *Mobile County,* 209 U. S. 405; *Blumenstock Bros.* v. *Curtis Pub. Co.,* 252 U. S. 436; *Federal Baseball Club* v. *National League,* 259 U. S. 200. Without them, North American would be unable to float the various security issues of its own or of its subsidiaries, thereby selling securities to residents of every state in the nation. Without them, North American would be unable to exercise and maintain the influence arising from its large stock holdings, receiving notices and reports, sending proxies to stockholders' meetings, collecting dividends and interest, and transmitting whatever instructions and advice may be necessary. Nor could North American maintain its

other relationships and contacts with its own subsidiaries without the use of the mails and facilities of interstate commerce. Such interstate commercial transactions involve the very essence of North American's business. See *International Textbook Co.* v. *Pigg,* 217 U. S. 91. They enable it "to promote the sound development" of its investments from its headquarters in New York City. In short, they are commerce which concerns more states than one. *Gibbons* v. *Ogden,* 9 Wheat. 1, 194; *Second Employers' Liability Cases,* 223 U. S. 1, 46; *Minnesota Rate Cases,* 230 U. S. 352, 398. As stated by this Court in *Associated Press* v. *Labor Board,* 301 U. S. 103, 128, "Interstate communication of a business nature, whatever the means of such communication, is interstate commerce regulable by Congress under the Constitution."

Moreover, North American concedes that four of its direct utility subsidiaries, Union Electric Company of Missouri, Washington Railway and Electric Company, North American Light & Power Company and Wisconsin Electric Power Company, transmit energy across state lines and hence are engaged in interstate commerce. It further concedes that its subsidiary West Kentucky Coal Company is engaged in interstate commerce, although contending that the remaining five direct subsidiaries are not so engaged. In view of North American's very substantial stock interest and its domination as to the affairs of its subsidiaries, as well as its latent power to exercise even more affirmative influence, it cannot hide behind the façade of a mere investor. Their acts are its acts in the sense that what is interstate as to them is interstate as to North American. These subsidiaries thus accentuate and add materially to the interstate character of North American. *Electric Bond & Share Co.* v. *Securities & Exchange Commission, supra,* 440. They make even more inescapable the conclusion that North American bears not only a "highly important relation to interstate commerce

and the national economy," *id.*, p. 441, but is actually engaged in interstate commerce. It is thus subject to appropriate regulatory measures adopted by Congress under its commerce power.

Turning to § 11 (b) (1) [7] and its constitutional impact upon North American, we find that it directs the Commission to apply its provisions to holding companies engaged in interstate commerce. In essence, it confines the operations of each holding company system to a single inte-

---

[7] "Sec. 11. (a) . . .

"(b) It shall be the duty of the Commission, as soon as practicable after January 1, 1938:

"(1) To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system: *Provided, however,* That the Commission shall permit a registered holding company to continue to control one or more additional integrated public-utility systems, if, after notice and opportunity for hearing, it finds that—

"(A) Each of such additional systems cannot be operated as an independent system without the loss of substantial economies which can be secured by the retention of control by such holding company of such system;

"(B) All of such additional systems are located in one State, or in adjoining States, or in a contiguous foreign country; and

"(C) The continued combination of such systems under the control of such holding company is not so large (considering the state of the art and the area or region affected) as to impair the advantages of localized management, efficient operation, or the effectiveness of regulation.

The Commission may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business (other than the business of a public-utility company as such) which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems."

grated public utility system with provision for the retention of additional systems only if they are relatively small, located close to the single system and unable to operate economically under separate management without the loss of substantial economies; in addition, other holdings may be retained only if their retention is related to the operations of the retained utility properties.

These requirements of § 11 (b) (1) apply only to registered holding companies. A holding company, by statutory definition, is a company that controls or possesses a controlling influence over an electric or gas utility company. § 2 (a) (7). A holding of 10% or more of the outstanding voting securities of such a utility company is presumed to be sufficient to constitute such a relationship, but this presumption may be rebutted by proof before the Commission of a lack of control or controlling influence. Accordingly, a company that is a mere investor in utility securities and that does not control or possess a controlling influence over the utility companies need not comply with § 11 (b) (1).

A holding company as so defined must register and hence must obey the commands of § 11 (b) (1) if it uses the mails or the instrumentalities of interstate commerce directly or through its subsidiaries in the operation of its business.[8] Thus a holding company may sell, transport or distribute gas or electric energy in interstate commerce. § 4 (a) (1). It may use the mails or interstate commerce to negotiate or perform service, sales or construction con-

---

[8] Section 4 (b) compels holding companies to register if they have outstanding any security which has been distributed by the use of the mails or commerce, or offered for sale by like means, subsequent to January 1, 1925, and if that security is held on October 1, 1935, by any person not a resident of the state in which the holding company is organized. We need not here consider the force of this section, however, since North American and other interstate holding companies are forced to register by reason of the provisions of § 4 (a).

tracts with other companies in the system. § 4 (a) (2). It may use the mails or interstate commerce to distribute or make public offerings for the sale or exchange of securities of its own or of other system companies. § 4 (a) (3). It may use the mails or interstate commerce to acquire securities or utility assets of other companies. § 4 (a) (4). It may engage in a business in interstate commerce. § 4 (a) (5). Or it may own or control securities of subsidiaries that do any of the foregoing acts. § 4 (a) (6). Moreover, § 2 (a) (28) defines "interstate commerce," as used in these and other provisions of the Act, to mean "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."

By making these enumerated interstate transactions unlawful unless the holding company registers with the Commission and by extending § 11 (b) (1) to registered holding companies, Congress has effectively applied § 11 (b) (1) to those holding companies that are in fact in the stream of interstate activity and that affect commerce in more states than one. Congress has further declared in § 1 (c) that all the provisions of the Act, thus including § 11 (b) (1), shall be interpreted to meet the problems and remove the evils connected with public utility holding companies "which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce . . ." Section 11 (b) (1) is thus clearly and unmistakably applicable to holding companies engaged in interstate commerce.

Not all holding companies that are engaged in interstate activities, however, must necessarily comply with § 11 (b) (1). By the terms of § 3 (a) (1), if a holding company and all of its subsidiaries are predominantly intrastate in character and carry on their business substantially in a single state in which such holding company and every subsidiary thereof are organized, the Commis-

sion may grant an exemption from any provision of the Act "unless and except insofar as it finds the exemption detrimental to the public interest or the interest of investors or consumers . . ."

The power of the Commission under the "unless and except" clause of § 3 (a) to deny an exemption to a predominantly local holding company does not mean, as North American urges, that a holding company having no relation whatever to interstate commerce may be subjected to § 11 (b) (1) or to any other provision of the Act. The Commission, in denying an exemption under this clause, is bound by the policy set forth in § 1 (c) to act so as to eliminate evils connected with holding companies "engaged in interstate commerce or in activities which directly affect or burden interstate commerce . . ." A holding company predominantly local in character may nevertheless engage in activities affecting or burdening interstate commerce to the detriment of the public interest or the interests of investors and consumers. Only in such a case could the Commission properly deny an exemption under the "unless and except" clause.[9] This problem, however, is academic so far as North American is concerned. Like most public utility holding companies, North American is engaged in interstate commerce directly and through its subsidiaries. It can lay no claim to a predominantly intrastate character; as to it, § 3 (a) (1) is wholly inapplicable. The possibility that the Commission might erroneously fail to exempt some truly local holding company from the provisions of § 11 (b) (1) cannot negative the plain fact that § 11 (b) (1)

---

[9] The Commission has recognized the fact that the declaration of policy in § 1 (c) must be considered in granting or denying exemptions under § 3 (a) to predominantly intrastate holding companies. See *In re Niagara Hudson Power Corporation*, Holding Company Act Release No. 5115; *In re Long Island Lighting Company*, Holding Company Act Release No. 5746.

was designed to apply and does apply to holding companies engaged in interstate commerce. North American is therefore subject to its terms.

The crucial constitutional issue, so far as the commerce clause is concerned, resolves itself into the query whether Congress may validly require holding companies engaged in interstate commerce to dispose of their security holdings and to confine their activities in accordance with the standards of § 11 (b) (1). In urging the negative answer to this query, North American relies upon the settled doctrine that the federal commerce power extends to intrastate activities only where those activities "so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." *United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110, 119. See also *Santa Cruz Fruit Packing Co.* v. *Labor Board*, 303 U. S. 453, 466; *United States* v. *Darby*, 312 U. S. 100, 118–123; *Wickard* v. *Filburn*, 317 U. S. 111, 122–124. It is said that the ownership by North American of securities of other system companies is not in itself commerce, interstate or intrastate, and that the right to own or retain property is characteristically governed by state laws, the Federal Government having no concern with such matters except as an incident to the due exercise of one of its granted powers. North American denies that the necessary relationship between the ownership of securities and interstate commerce is self-evident or that it has been found as a fact by Congress, the Commission or any court. The absence of this relationship, it is concluded, causes § 11 (b) (1) to fall.

This argument, however, misconceives not only the power of Congress over interstate commerce but also the basic nature of public utility holding companies and the effect that stock ownership has upon their activities.

The dominant characteristic of a holding company is the ownership of securities by which it is possible to control or substantially to influence the policies and management of one or more operating companies in a particular field of enterprise.[10]  To be sure, other devices may be utilized to effectuate control, such as voting trusts, interlocking directors and officers, the control of proxies, management contracts and the like.  But the concentrated ownership of voting securities is the prime method of achieving control, constituting a more fundamental part of holding companies than of other types of business.  Public utility holding companies are thereby able to build their gas and electric utility systems, often gerrymandered in such ways as to bear no relation to economy of operation or to effective regulation.  The control arising from this ownership of securities also allows such holding companies to exact unreasonable fees, commissions and other charges from their subsidiaries, to make undue profits from the handling of the issue, sale and exchange of securities for their subsidiaries, to issue unsound securities of their own based upon the inflated value of the subsidiaries, and to affect adversely the accounting practices and the rate and dividend policies of the subsidiaries.  See § 1 (b).[11]

---

[10] Bonbright and Means, The Holding Company (1932), p. 10; Jones and Bigham, Principles of Public Utilities (1931), p. 589; Hearings before House Committee on Interstate and Foreign Commerce, 74th Cong., 1st Sess., on H. R. 5423, Part 1, pp. 76–77.

[11] The congressional findings as to abuses listed in § 1 (b) were based upon some of the most exhaustive and comprehensive studies ever to underlie a federal statute.  Congress specifically referred in § 1 (b) to the studies made by the Federal Trade Commission pursuant to S. Res. 83, 70th Cong., 1st Sess., the reports of the House Committee on Interstate and Foreign Commerce made pursuant to H. Res. 59, 72nd Cong., 1st Sess., and H. J. Res. 572, 72nd Cong., 2d Sess.  A summary of the manifold and complex abuses revealed by these studies is contained in the Federal Trade Commission Report, *supra*, note 3.  See Barnes, The Economics of Public Utility Regulation (1942), p. 71.

Congress has found that all of these various abuses and evils occur and are spread and perpetuated through the mails and the channels of interstate commerce. And Congress has further found that such interstate activities, which grow out of the ownership of securities of operating companies, have caused public utility holding companies to be "affected with a national public interest." § 1 (a).[12]

The ownership of securities of operating companies, then, has a real and intimate relation to the interstate activities of holding companies and cannot be effectively divorced therefrom. That ownership is the generating force of the constant interstate flow of reports, letters, equipment, securities, accounts, instructions and money— all of which constitute the life blood of holding companies and allow the numerous abuses to be effectuated. It also makes the interstate transmission of gas and electricity by the subsidiaries, as well as their other interstate actions, reflect upon and magnify the interstate character of the holding companies. Without the factor of stock ownership the very foundation and framework of holding company systems would be gone and the amount of their interstate activity would be at a minimum; centralized management and control of widely scattered utility properties would be difficult if not impossible.

We may assume without deciding that the ownership of securities, considered separately and abstractly, is not

---

[12] The fact that § 1 (a) refers to certain activities of holding companies as "often" occurring in or affecting interstate commerce and that § 1 (b) refers to adverse effects "when" certain abuses and evils occur is but an instance of careful draftsmanship. Contrary to North American's contentions, the use of the words "often" and "when" does not imply that Congress felt that the relationships of some holding companies to commerce were negligible or that the abuses were other than general in nature. Those words merely recognize that interstate activities are not necessarily constant and that the abuses may arise from time to time. That is enough, however, to support legislative action. See *Chicago Board of Trade* v. *Olsen*, 262 U. S. 1, 40.

commerce. But when it is considered in the context of public utility holding companies and their subsidiaries, its relationship to interstate commerce is so clear and definite as to make any other conclusion unreasonable. And Congress has plainly recognized that relationship in its declarations of policy in § 1 (a), in its enumeration of abuses in § 1 (b) and in its description of interstate activities of holding companies in § 4 (a). Such statements would be utterly meaningless in the light of reality were they not premised upon the ownership of securities by holding companies and the use of that ownership to burden and affect the channels of interstate commerce.

Section 11 (b) (1) is concerned with, and operates directly upon, this ownership of securities. In § 1 (b) (4) Congress specifically found that the national public interest, the interest of utility investors and the interest of utility consumers are or may be adversely affected "when the growth and extension of holding companies bears no relation to economy of management and operation or the integration and coordination of related operating properties . . ."[13] The "growth and extension of holding com-

---

[13] "The growth of the holding-company systems has frequently been primarily dictated by promoters' dreams of far-flung power and bankers' schemes for security profits, and has often been attained with the great waste and disregard of public benefit which might be expected from such motives. Whole strings of companies with no particular relation to, and often essentially unconnected with, units in an existing system have been absorbed from time to time. The prices paid for additional units not only have been based upon inflated values but frequently have been run up out of reason by the rivalry of contending systems. Because this growth has been actuated primarily by a desire for size and the power inherent in size, the controlling groups have in many instances done no more than pay lip service to the principle of building up a system as an integrated and economic whole, which might bring actual benefits to its component parts from related operations and unified management. Instead, they have too frequently given us massive, overcapitalized organizations of ever

panies" obviously rest upon their security holdings. Congress expressed in § 1 (c) its determination "to compel the simplification of public-utility holding-company systems and the elimination therefrom of properties detrimental to the proper functioning of such systems," thus eliminating the evil complained of in § 1 (b) (4) and ameliorating the conditions specified in the other subsections of § 1 (b). It accordingly adopted § 11 (b) (1), whereby holding companies are compelled to integrate and coordinate their systems and to divest themselves of security holdings of geographically and economically unrelated properties. In this way Congress hoped to rejuvenate local utility management and to restore effective state regulation, both of which had been seriously impaired by the existence and practices of nation-wide holding company systems.[14]

The constitutionality of § 11 (b) (1) under the commerce clause thus becomes apparent. For nearly one hundred and twenty-five years, this Court has recognized that the power of Congress over interstate commerce is "the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons* v. *Ogden, supra*, 196. This is not to say, of course, that Congress is an absolute sovereign. It is limited by

increasing complexity and steadily diminishing coordination and efficiency." Report of the National Power Policy Committee on Public-Utility Holding Companies, H. Doc. 137, 74th Cong., 1st Sess., p. 5.

[14] "As has been pointed out above, the purpose of section 11 is simply to provide a mechanism to create conditions under which effective Federal and State regulation will be possible. It is therefore the very heart of the title, the section most essential to the accomplishment of the purposes set forth in the President's message." S. Rep. 621, 74th Cong., 1st Sess., p. 11.

express provisions in other parts of the Constitution, such as § 9 of Article I and the Bill of Rights. But so far as the commerce clause alone is concerned Congress has plenary power, a power which "extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations." *Minnesota Rate Cases, supra,* 399.

This broad commerce clause does not operate so as to render the nation powerless to defend itself against economic forces that Congress decrees inimical or destructive of the national economy. Rather it is an affirmative power commensurate with the national needs. It is unrestricted by contrary state laws or private contracts. And in using this great power, Congress is not bound by technical legal conceptions. Commerce itself is an intensely practical matter. *Swift & Co.* v. *United States,* 196 U. S. 375, 398. To deal with it effectively, Congress must be able to act in terms of economic and financial realities. The commerce clause gives it authority so to act.

We need not attempt here to draw the outer limits of this plenary power. It is sufficient to reiterate the well-settled principle that Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature. *Brooks* v. *United States,* 267 U. S. 432, 436–437. This power permits Congress to attack an evil directly at its source, provided that the evil bears a substantial relationship to interstate commerce. Congress thus has power to make direct assault upon such economic evils as those relating to labor relations, *Labor Board* v. *Jones & Laughlin*

*Corp.,* 301 U. S. 1; *Polish Alliance* v. *Labor Board,* 322 U. S. 643; to wages and hours, *United States* v. *Darby, supra;* to market transactions, *Stafford* v. *Wallace,* 258 U. S. 495; *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1; and to monopolistic practices, *Northern Securities Co.* v. *United States, supra.* The fact that an evil may involve a corporation's financial practices, its business structure or its security portfolio does not detract from the power of Congress under the commerce clause to promulgate rules in order to destroy that evil. Once it is established that the evil concerns or affects commerce in more states than one, Congress may act. "The framers of the Constitution never intended that the legislative power of the nation should find itself incapable of disposing of a subject matter specifically committed to its charge." *In re Rahrer,* 140 U. S. 545, 562.

Congress in § 11 (b) (1) of the Public Utility Holding Company Act was concerned with the economic evils resulting from uncoordinated and unintegrated public utility holding company systems. These evils were found to be polluting the channels of interstate commerce and to take the form of transactions occurring in and concerning more states than one. Congress also found that the national welfare was thereby harmed, as well as the interests of investors and consumers. These evils, moreover, were traceable in large part to the nature and extent of the securities owned by the holding companies. Congress therefore had power under the commerce clause to attempt to remove those evils by ordering the holding companies to divest themselves of the securities that made such evils possible.

It follows that North American's contention that the ownership of securities is not in itself interstate commerce and hence may not be made the basis of federal legislation misconceives the issue in this case. Precisely the same

misconception was made more than forty years ago by the appellants in *Northern Securities Co.* v. *United States, supra,* 334–335, and was rejected by this Court. Inasmuch as Congress may protect the freedom of interstate commerce by any means that are appropriate and that are lawful and not prohibited by the Constitution, this Court in the *Northern Securities Co.* case recognized that Congress may deal with and affect the ownership of securities in order to protect the freedom of commerce. Congress likewise has the power in this case.

In fashioning the remedy decreed by § 11 (b) (1), Congress was following a pattern set many years ago by decisions applying the Sherman Antitrust Act, *Northern Securities Co.* v. *United States, supra; Standard Oil Co.* v. *United States,* 221 U. S. 1; *Continental Ins. Co.* v. *United States,* 259 U. S. 156, and the commodities clause of the Hepburn Act, *United States* v. *Lehigh Valley R. Co.,* 220 U. S. 257; *United States* v. *Delaware, L. & W. R. Co.,* 238 U. S. 516. In so affecting the corporate structure of holding companies, it was exercising its power "to foster, protect and control the commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety." *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 456, 478. It is clear, therefore, that § 11 (b) (1) is invulnerable to attack under the commerce clause.

The constitutionality of § 11 (b) (1) is also questioned from the standpoint of the due process clause of the Fifth Amendment. North American argues that this section, by compelling it to divest itself of its scattered subsidiaries and to confine its operations to a single integrated system, involves a taking of property without just compensation. It is also claimed that such evils as were found to exist in public utility holding companies find an adequate remedy

in other sections of the Act and that § 11 (b) (1) is therefore inappropriate. Neither contention is meritorious.[15]

The taking of property is said to involve "a vast destruction of values." Reference is made in this respect to the valuable right of North American's shareholders to pool their investments and thereby obtain the benefit alleged to flow from efficient, common management of diversified interests. But Congress balanced the various considerations and concluded that this right is clearly outweighed by the actual and potential damage to the public, the investors and the consumers resulting from the use made of pooled investments. Under such circumstances, whatever value this right may have does not foreclose the protection of the various interests which Congress found to be paramount. See *Northern Securities Co.* v. *United States, supra.* Nor does the value of North American's contributions as a holding company to the earning power and intrinsic value of the assets divested pursuant to § 11 (b) (1) bar Congress from requiring such divestment. Congress has concluded from the extensive studies made prior to the passage of the Act that the economic advantages of a holding company at the top of an unintegrated, sprawling system are not commensurate with the resulting economic disadvantages. The reasonableness of that conclusion is one for Congress to determine. The fact that valuable interests may be affected does not, by itself, render invalid under the due process clause the determination made by Congress.

---

[15] The contention also is made that the fact that § 11 (b) (1) requires disposition of security holdings and the termination of relationships which antedate the passage of the Act is fatal to its validity. But it merely requires that such holdings and relationships shall not continue in the future. There is no punishment for past events. Certainly there is no constitutional requirement that the status quo be maintained. See *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 342.

Moreover, there is no basis here for assuming that in limiting the scope of North American's operations there will be dispositions of securities for inadequate considerations, thereby raising a question as to whether there is a destruction of these values without just compensation. The Act does not contemplate or require the dumping or forced liquidation of securities on the market for cash.[16] Under §§ 11 (d) and 11 (e) of the Act, any divestment or reorganization plan must meet the standards of fairness and equitableness. In many instances this may involve no more than a distribution of the securities among the existing shareholders of the holding company.[17] But should securities be sold for cash, speculation as to unfavorable market conditions cannot undermine the validity of § 11 (b) (1). Any plan of divestment or reorganization, moreover, must be carefully scrutinized by both the Commission and the enforcing court, thus enabling the assertion and protection of all shareholders' rights. See *Otis & Co.* v. *Securities & Exchange Commission*, 323 U. S. 624. And there are provisions in the

---

[16] "As has been explained above, the title does not require the dumping or forced liquidation of securities. Such disposition as may be necessary can be accomplished by reorganization which will equitably redistribute securities among existing security holders. Insofar as there may be some redistribution of the securities of operating companies through investment banking channels, this will not result in a substantial net increase in the supply of utility securities on the market because for every block of operating securities distributed there will be a corresponding block of holding-company securities retired. The net effect of such changes will be to strengthen the market for utility securities generally by replacing holding-company securities with sound operating-company securities. Such operations, primarily of a refunding nature, should strengthen rather than weaken the credit of operating companies." S. Rep. 621, 74th Cong., 1st Sess., p. 16.

[17] North American has already disposed of its holdings of Detroit Edison Company common stock under a plan distributing the stock to North American's stockholders over a period of time. *In re The North American Company*, Holding Company Act Release No. 4056.

Act guarding against unduly rapid divestment or liquidation.[18] In the light of such statutory and judicial safeguards and in the absence of any alleged unfair plan of divestment, we cannot say that North American's shareholders are adversely affected, from a constitutional standpoint, by the operation of § 11 (b) (1). North American's reliance on such cases as *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555, is therefore misplaced.

It is true, as North American points out, that other sections of the Act provide for the regulation of many activities of holding companies and their subsidiaries, activities that were found to give birth to many of the evils about which Congress was concerned. But such sections regulate future transactions, whereas § 11 (b) (1) is concerned with the existing structures of holding company systems. These structures in and of themselves have been found by Congress to constitute an evil that cannot be met by simply regulating future transactions. Congress, in the exercise of its discretion, has decided that it is necessary to reorganize the holding company structures. And inasmuch as it has the constitutional power to do so, we cannot question the appropriateness or propriety of its decision. *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 394.

Finally, North American claims that it has engaged in none of the evils enumerated in § 1 (b) and that it should be allowed to prove that fact. The contention apparently is that § 11 (b) (1), as applied to North American, is unconstitutional since none of the evils that led Congress to enact the statute is present in this instance. But if evils disclosed themselves which entitled Congress to legislate

---

[18] Under § 11 (c), holding companies are given at least a year to comply with an order of the Commission under § 11 (b). The Commission is also authorized to extend the time for an additional year upon a proper showing.

as it did, Congress had power to legislate generally, unlimited by proof of the existence of the evils in each particular situation. Section 11 (b) (1) is not designed to punish past offenders but to remove what Congress considered to be potential if not actual sources of evil. And nothing in the Constitution prevents Congress from acting in time to prevent potential injury to the national economy from becoming a reality.

The judgment of the court below is accordingly

*Affirmed.*

MR. JUSTICE REED, MR. JUSTICE DOUGLAS and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.