**MICHIGAN CONSOLIDATED GAS COMPANY and Michigan Consolidated Homes Corporation, Petitioners,**

**v.**

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**MICHIGAN CONSOLIDATED GAS COMPANY et al., Petitioners,**

**v.**

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**Nos. 24564, 24663, 24664.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 17, 1970.

Decided April 16, 1971.

---

4. 133 U.S.App.D.C. 274, 410 F.2d 262 (1969).

5. *Id.,* at 277, 410 F.2d, at 265.

Mr. Arthur R. Seder, Jr., Detroit, Mich., of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of Court, with whom Messrs. Gary L. Cowan and Richard J. Flynn, Washington, D.C., were on the brief, for petitioners.

Mr. Aaron Levy, Special Counsel, Securities and Exchange Commission, with whom Messrs. Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Solicitor, and Mrs. Kathryn B. McGrath, Washington, D.C., Atty., Securities and Exchange Commission, were on the brief, for respondent.

Before TAMM and ROBB, Circuit Judges, and SMITH,* Chief Judge, U. U. District Court for the District of Montana.

TAMM, Circuit Judge:

These cases arise on petitions by Michigan Consolidated Gas Company (hereinafter "Michigan Consolidated") and Michigan Consolidated Homes Corporation (hereinafter "Homes Corporation") for review of three orders issued by the Securities and Exchange Commission (hereinafter "the Commission") under the Public Utility Holding Company Act of 1935 (hereinafter "the Act"), 15 U.S.C. § 79 *et seq.* (1964). Michigan Consolidated is a gas utility subsidiary company of American Natural Gas Company, a registered holding company regulated by the Commission under the Act. Michigan Consolidated distributes natural gas at retail in various cities in Michigan including Detroit. Homes Corporation is a wholly-owned subsidiary of Michigan Consolidated and was organized to construct and operate low and moderate income housing projects in and around Detroit pursuant to the National Housing Act, 12 U.S.C. § 1701 *et seq.* (1964).

The first of the three orders under review issued June 22, 1970 (App. 126; Holding Co. Act Release No. 16763) and was a denial by the Commission of an application in which Homes Corporation requested authority to issue, and Michigan Consolidated sought authority to acquire, up to $500,000 in Homes Corporation common stock and up to $6,000,000 in short-term Homes Corporation notes to finance construction of two housing projects (the "Elmwood I project" and the "Inkster project") in the Detroit area. (App. 1–8; S.E.C. File No. 70–4778.) The order further provided that Homes Corporation divest itself of all its interests in the two projects and that Michigan Consolidated divest itself of all its interests in Homes Corporation. In two subsequent orders issued August 26, 1970 (App. 151–53; Holding Co. Act Release No. 16819) and September 22, 1970 (App. 164–65; Holding Co. Act Release No. 16842) the Commission denied petitioners' motions for an "interim order" and "limited relief" filed subsequent to issuance of the June 22 order. For the following reasons we affirm the orders of the Commission.

I.

Since Michigan Consolidated is a subsidiary of a registered public utility holding company, it is required under section 9(a) (1) of the Act, 15 U.S.C. § 79i(a) (1) (1964), to receive prior approval from the Commission to acquire any securities or any other interest in any business. Before such approval may be granted, however, the contemplated acquisition must be found not "detrimental to the carrying out of the provisions of section [11] of [the Act]." 15 U.S.C. § 79j(c) (1) (1964). The provisions of section 11 pertinent to this case are as follows:

(b) It shall be the duty of the Commission * * *:

(1) To require by order * * * that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a

---

* Sitting by designation pursuant to 28 U.S.C. § 292(c) (1964).

part to a single integrated public-utility system, and *to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system * * *. The Commission may permit as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems the retention of an interest in any business * * * which the Commission shall find necessary or appropriate in the public interest * * *.*

15 U.S.C. § 79k(b) (1) (1964) (Emphasis added.)

The diverse interpretations attached to section 11(b) (1) by the Commission and the petitioners are the heart of the dispute before us. The Commission in construing this section has adopted what has been referred to as the "functional relationship" test in order to determine whether the retention of a particular business is permissible under the Act. To pass this test the holding company or its subsidiary must clear two hurdles. First, the company must show that its "other business" is "reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system." (*Id.*) Once a company has cleared this hurdle, the Commission then looks to see whether the second sentence of section 11(b) (1) is adhered to, *i. e.*, whether the retention of the "other business" is "necessary or appropriate in the public interest." (*Id.*) In this case the Commission held that petitioners failed even to clear the first hurdle and as a result felt it unnecessary to reach the "public interest" question.

The petitioners' construction of section 11(b) (1) is altogether different from that of the Commission's. Petitioners argue that an *independent* finding of "public interest" in the retention of the "other business" satisfies the requirements of section 11(b) (1), thereby making it unnecessary to find a rela-

tionship in the operations of the business involved. We think that prior judicial decisions, the principles of statutory construction, and the legislative history call for adoption of the Commission's interpretation.

An analysis of the wording of the Act substantiates the Commission's interpretation of section 11(b) (1). Section 1(c), 15 U.S.C. § 79a(c) (1964), states that *all the provisions* of the Act shall be interpreted "to meet the problems and eliminate the evils as enumerated in this section." After a careful study, Congress listed in section 1(b) (4) one such evil to be present "when the growth and extension of holding companies bears *no relation to economy of management and operation or the integration and coordination of related operating properties.*" 15 U.S.C. § 79a(b) (4) (1964) (Emphasis added.) Further it is provided in section 11(a), 15 U.S.C. § 79k(a) (1964), that it is the duty of the Commission to examine the corporate structure of every registered holding company system with an eye toward confining the businesses thereof "to those necessary or appropriate to the operations of an integrated public-utility system." (*Id.*) The Commission interpretation also seems quite logical even if we were to focus only on section 11(b) (1). The second sentence or "public interest" sentence of section 11(b) (1) provides that:

The Commission may permit *as reasonably incidental, or economically necessary or appropriate to the operations of one or more integrated public-utility systems* the retention of an interest in any business * * * which the Commission shall find necessary or appropriate in the public interest or for the protection of investors or consumers and not detrimental to the proper functioning of such system or systems.

15 U.S.C. § 79k(b) (1) (1964) (Emphasis added.) Inclusion of the italicized portion of this sentence indicates that retention of a business deemed appropriate in the "public interest" must still be

"reasonably incidental, or economically necessary or appropriate to the operations" of the public utility system. Any other interpretation of the second sentence would render the italicized portion meaningless.

Prior judicial decisions also support the Commission interpretation. In Engineers Public Service Co. v. S. E. C., 78 U.S.App.D.C. 199, 138 F.2d 936 (1943), vacated as moot, 332 U.S. 788, 68 S.Ct. 96, 92 L.Ed. 370 (1947) this court held the Commission's "functional relationship" interpretation of section 11(b) (1) to be incorrect. Earlier the same year, however, the Second Circuit in North American Co. v. S. E. C., 133 F.2d 148 (2d Cir. 1943), aff'd on other grounds, 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945 (1946) adopted the Commission's interpretation. The Supreme Court granted certiorari in both the *Engineers* case, 322 U.S. 723, 64 S.Ct. 1273, 88 L.Ed. 1561 (1944) and the *North American* case, 318 U.S. 750, 63 S.Ct. 764, 87 L.Ed. 1126 (1943). The cases were argued together in the Supreme Court, but, after a voluntary divestment by the Engineers Public Service Company of the properties involved in its case, the judgment of this court was vacated for mootness. Engineers Public Service Co. v. S.E.C., *supra*, 332 U.S. 788, 68 S.Ct. 96. The Supreme Court in the *North American* case limited itself to the resolution of a constitutional question, but by way of dicta approved the "functional relationship" test. North American Co. v. S.E.C., *supra*, 327 U.S. at 697, 66 S.Ct. 785. More than three years after the Supreme Court decision in *North American* issued, this court had another opportunity to resolve the section 11(b) (1) dilemma. In Philadelphia Co. v. S.E.C., 85 U.S.App.D.C. 327, 333, 177 F.2d 720, 726 (1949), this court re-evaluated its prior stand on section 11(b) (1) and clearly adopted the Commission interpretation

and the dicta of the Supreme Court. It is evident then that prior case law supports the Commission's position. Since the Commission interpretation of section 11(b) (1) is the correct one and since the operations of a low-rent housing project are not "reasonably incidental, or economically necessary or appropriate to the operations" of a natural gas company, the Commission was correct in not permitting Michigan Consolidated's retention of interest in Homes Corporation.

## II.

Petitioners advance a second argument in support of retention of Homes Corporation. The origin of petitioners' second contention dates back to an order of the Commission prior to the ones now at issue. In that order of March 31, 1969, the Commission authorized Michigan Consolidated to acquire a maximum of $500,000 in Homes Corporation common stock and up to $3,000,000 in its short-term promissory notes for the construction of a low-rent housing project in the Detroit inner city.[1] The Commission was informed that this was to be a "pilot project" and that if successful petitioners contemplated engaging in other housing projects in the future. It also developed that the amount actually expended on the "pilot project" was less than the amount authorized by the Commission. On the basis of these two facts the petitioners argue that the March 31, 1969 order authorized at least the initial financing of the two projects involved here. A careful reading, however, of the Commission's March 31 opinion indicates clearly only an approval of the one housing project, i. e., the "pilot project." (App. 103–13; Holding Co. Act Release No. 16331.) All that can be said for the petitioners is that they might well have reasonably anticipated Commission ap-

---

1. At the time of this order the Commission had two members who were not proponents of the "functional relationship" test. One other member favored the acquisition on another ground. Unfortunately for the petitioners, since this decision the composition of the Commission has changed, with the result that it did not approve the similar acquisitions at issue now.

proval of the "Elmwood I" and "Inkster" projects since they were quite similar to the one already approved in the March 31 order. This, however, is no legal excuse for commencing the projects without the authorization required by the Act.[2]

## III.

■ Petitioners finally contend that they are entitled to authorization under section 9(c) (3) of the Act, 15 U.S.C. § 79i(c) (3), which would allow "certain acquisition of commercial paper and other securities, within such limitations, as the Commission may by rules and regulations or order prescribe as appropriate in the ordinary course of business" of the public utility company. The section 9(c) (3) exemption being sought here, however, as the petitioners admit (see Brief for Petitioners at 43), is "subject to dollar limits and is inapplicable where the acquisition of securities would result in control." (Id.) Section 9(c) (3) therefore cannot justify the retention requested in this case.

■ The remaining legal issue to be decided is the propriety of the Commission's denial of petitioners' motions for an "interim order" and "limited relief" filed subsequent to issuance of the June 22 order. We think reversal of the Commission's ruling in this regard would leave the Act with little or no teeth. Furthermore, there has been no prospective showing that denial of this relief would render any substantial harm to Michigan Consolidated, its investors, or any of its customers.

Though in administering our judicial duties we have somewhat chastized petitioners, it is with great reluctance that we do so, for their only sin seems to have been an overeager response to their social conscience as corporate citizens of the city of Detroit. It has become common knowledge that many of our inner city woes can be traced directly to the numerous dilapidated and run-down apartments and houses that, though unfit for human habitation, are the homes of far too many people. The efforts of companies like Michigan Consolidated to react positively to the need should be encouraged. If these companies show by example it can be done, there might well be brought about an exponential increase in interest among private industries willing to lend a hand. We as a court, however, are unwilling and unable to write the National Housing Act into the Public Utility Holding Company Act of 1935. This can only be accomplished by Congress. We have been informed that the United States Senate, on September 23, 1970, passed a housing bill [3] which contained an amendment that would have permitted the type of acquisition Michigan Consolidated is seeking. The bill became law [4] but the relevant amendment was rejected by the conferees [5] just before the last session of Congress terminated. Inasmuch as this

---

2. Prior to July 29, 1969, when the 1969 application was filed, petitioners began construction of the Inkster project. (App. 3; S.E.C. File No. 70-4778.) Construction of the "Elmwood I" project was started after the filing of the application, but before the Commission had acted on the matter. As of October 15, 1969, the "Inkster" project was 50% completed (App. 13; S.E.C. File No. 70-4778); by January 16, 1970, the "Inkster" project was 75% completed and the "Elmwood I" project was 10% completed. (App. 17; S.E.C. File No. 70-4778.)

3. S. 4368, 91st Cong., 2d Sess. (1970) (116 Cong.Rec. S16418-16431 (daily ed. Sept. 23, 1970)).

4. Housing and Urban Development Act of 1970, Pub.L.No. 91-609, 84 Stat. 1770, December 31, 1970.

5. "The Senate bill contained a provision authorizing public utility holding companies to participate in the provision of low and moderate-income housing. The House bill contained no such provision. Conferees rejected the provision because the House conferees were adamant that such authority in a conference report involving housing legislation would be subject to a point of order by the House of Representatives." 116 Cong.Rec. S20655 (daily ed. Dec. 18, 1970).

amendment would seem to be an invaluable aid to the public and has the endorsement of the Secretary of HUD (116 Cong.Rec. S13850 (daily ed. Aug. 20, 1970)) and the Commission (*Id.*), it is hoped that our decision today will inspire further consideration of this matter by Congress as soon as its busy schedule allows.

Affirmed.