In re **ELSINORE CORPORATION, Elsub Management Corporation, Palm Springs East Limited Partnership, and Four Queens, Inc.,** Debtors.

**Plaintiff's Class Claimants in New Jersey Actions,** Appellants,

v.

Elsinore Corporation; et al., Appellees.

BAP No. NV–97–1544–MeRRy.

Bankruptcy Nos. 95–24685–RCJ, 95–24689–RCJ, 95–24688–RCJ and 95–24686–RCJ.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted June 19, 1998.

Decided Dec. 23, 1998.

Andrew J. Kahn, San Francisco, CA, for Plaintiff's.

Thomas H. Fell, Gordon & Silver, Las Vegas, NV, for Appellees.

Before: MEYERS, RUSSELL and RYAN, Bankruptcy Judges.

## *OPINION*

MEYERS, Bankruptcy Judge.

### I

The debtor was a holding company which had interests in several hotels and casinos, including the Atlantis Hotel and Casino ("Atlantis") in New Jersey. Former employees of the Atlantis sought priority treatment under 11 U.S.C. § 507(a)(3) for wages earned within 90 days of the cessation of the Atlantis. The bankruptcy court ruled that since the debtor was still functioning as a business at the time the Atlantis ceased operations, the former employees could not receive priority for wages "earned within 90 days before the date of ... the cessation of the debtor's business" as stated in Section 507(a)(3). The former employees appealed.

We **AFFIRM.**

### II

### FACTS

#### A. *The Entities*

Elsinore Corporation ("Debtor"), one of the Chapter 11 debtors in these jointly administrated cases, had many subsidiaries and affiliates. The Debtor controlled Elsinore Shore Associates ("ESA"), a general partnership that owned and operated the Atlantis. ESA had two partners. One of these was Elsub Corporation ("Elsub"). The Debtor owned 85 percent of Elsub. The other was Elsinore Atlantic City ("EAC"), a partnership whose general partner was a subsidiary of the Debtor. The Debtor, through its interests in Elsub and EAC, owned 91.5 percent of ESA until September 1988. ESA filed a Chapter 11 petition in New Jersey. After ESA's plan of reorganization was implemented, the Debtor owned 77.9 percent of ESA.

The Debtor also owned interests in other hotels and casinos. Its subsidiary Four Queens, Inc. owned the Four Queens Hotel in Las Vegas. Through two other subsidiaries, the Debtor had interests in two additional casinos.

The Atlantis opened in 1979. By the end of 1988, it employed almost 1900 people on site. Local 54 Hotel Employees and Restaurant Employees International Union ("Union") represented the hotel and food service employees. The appellants ("Appellants") are employees who worked with the gaming activities and were not represented by any union.

#### B. *The Legal Proceedings*

In November 1985, ESA filed a Chapter 11 bankruptcy petition in New Jersey. EAC and Elsub filed Chapter 11 petitions in New Jersey in July 1987. During the bankruptcy case, the Atlantis employees worked under a wage freeze.

In April 1988, Jeanne Hood, the Debtor's President and Chief Executive Officer, made a written promise to the Atlantis employees that they would receive a pay raise upon consummation of ESA's plan of reorganization. In November 1988, Hood notified the Appellants in writing that they would receive retroactive wage benefits beginning December 31, 1988. Her letter specified in detail when the benefits would be given, and conditioned the payments on additional service through December 1989. Most of the Appellants have not been paid the amount of retroactive benefits promised.

On May 22, 1989, the casino portion of the Atlantis was permanently closed by order of New Jersey's Casino Control Commission. Within the next several months, at least 1,300 employees were terminated. In June 1989, the Atlantis was sold.

In 1989, the Union and the Appellants filed actions in federal district court in New Jersey against the Debtor and three of its subsidiaries, alleging that the defendants: (1) violated the WARN Act, 29 U.S.C. § 2101 *et seq.*, by closing the casino without giving the plaintiffs 60 days notice; and (2) breached oral and written promises of compensation for services.

On October 31, 1995, before the district court ruled on the lawsuit, the Debtor, Four Queens, Inc. and four related entities filed Chapter 11 bankruptcy petitions in Nevada.

On March 4, 1996, the Appellants filed a proof of claim asserting priority status pursuant to 11 U.S.C. § 507(a)(3). The Debtor filed motions to deny priority, arguing that the Appellants' claims arose more than 90 days before the bankruptcy filing and that the Debtor had not ceased doing business.

In August 1996, the court confirmed the reorganization plan filed by the Debtor and its affiliates. Though all the debtors were included in the plan, the estates were not substantively consolidated. The plan provides for the continuation of the Debtor and at least three other entities as going concerns.

After a hearing concerning the proof of claim, the bankruptcy court rejected the Appellants' assertion that the cessation of business for Section 507(a)(3) purposes occurred when the Atlantis closed. An order allowing the Appellants' claim without priority was entered on November 7, 1996. After a timely motion for reconsideration of the court's order was denied, the employees filed a notice of appeal on July 11, 1997.

In October 1997, the New Jersey district court issued a judgment and findings of fact and conclusions of law. The court found in favor of the Atlantis's former employees on their contract claims and pierced the corporate veil to hold the Debtor liable. It rejected the employees' claims under the WARN Act.[1]

### III

### STANDARD OF REVIEW

■ As this appeal involves the construction of Section 507(a)(3), we employ the *de novo* standard of review. *In re Rau,* 113 B.R. 619, 620 (9th Cir. BAP 1990).

### IV

### DISCUSSION

At issue is whether the Debtor was operating a business at the time it filed for bankruptcy relief. We hold that it was.

In *Rau, supra,* we ruled that a debtor does not cease doing business under Section 507(a)(3) until all of its businesses cease operations. In *Rau,* the debtors had operated a mining business and restaurant. Though the mining operation closed in 1983, the restaurant continued in business until at least 1987, when the bankruptcy case was filed. The former employees of the mining company claimed priority for unpaid wages earned within 90 days before cessation of the mining business. The bankruptcy court held that Section 507(a)(3)'s reference to the "cessation of the debtor's business" meant the closing of all business operations of the debtors, not just the cessation of the particular business operation in which the wage claimant was employed. We affirmed, holding: "[F]or the purposes of § 507(a)(3), if a debtor operated more than one business, 'the debtor's business' refers to all of the debtor's various business operations in aggregate." *Id.* at 622.

*Rau* cited *In re Davidson Transfer & Storage Co. v. Teamsters Pension Fund,* 817 F.2d 1121 (4th Cir.1987). In *Davidson,* the court held that the closing of one of the employer's divisions, with a layoff of 600 of the employer's 800 employees, was not a "cessation of the debtor's business" under Section 507(a)(3). The court held that a debtor is not its division, and even though the debtor's business was much reduced, it had never ceased. *Id.* at 1123.

■ The court's remarks at the hearing on the motion for reconsideration suggest that it considered the Debtor to be in business after the Atlantis closed because the Debtor operated other casinos and hotels. We reject this view. The Debtor did not operate casinos and hotels after the Atlantis closed; the Debtor's subsidiaries did.

The hotels and casinos were owned by corporations and partnerships originally formed as separate legal entities, and, with the exception of Elsub, operated as separate entities and treated that way throughout the

---

1. The Appellants have moved to supplement the appellate record with the New Jersey district court's decision holding the Debtor liable for claims against Elsub. The decision does not affect the merits of the appeal. Because it is helpful in clarifying the Appellant's claims against the Debtor, we will grant the motion to supplement the record.

bankruptcy case. For purposes of determining when a debtor ceases doing business under Section 507(a), a separate corporate subsidiary of a debtor is significantly different than a business or division of the debtor which has not been given separate legal status. By creating the corporate subsidiaries, the Debtor shielded itself from their debts. It may not disregard the legalities of the corporate form just because now it is in bankruptcy. *Cf. Danjaq v. Pathe Communications Co.,* 979 F.2d 772, 775 (9th Cir. 1992)("the activities of a subsidiary should not be considered to determine its parent's principal place of business where there is no showing of an alter ego relationship").

The Debtor continued to act as a holding company after the Atlantis closed. The relevant question is whether a holding company is in business for the purpose of Section 507(a)(3). The answer is, it depends on the facts of the case.

In the context of federal tax law, a "mere" holding company has been defined as a "corporation having practically no activities except holding property and collecting the income therefrom or investing therein." Treas. Reg. § 1.533–1(c)(1963).

Holding companies may be more active than that. The court in *Taber Partners, I v. Merit Builders, Inc.,* 987 F.2d 57, 64 n. 9 (1st Cir.1993), distinguished cases concerning holding companies which did nothing more than hold assets, before determining that for jurisdictional purposes the appellant holding company's principal place of business was in New York, where it had an office, employees, bank accounts, a working capital account, corporate books and records and board of directors meetings. The court in *Allied Chemical Corp. v. United States,* 158 Ct.Cl. 267, 305 F.2d 433, 437 (Ct.Cl.1962), stated that the business of a holding company

> consists of conserving and protecting its holdings, influencing, or directing when it can, the management of the companies in which it holds stock, so as to increase the value of its holdings and the income to be derived therefrom, the collection of dividends, the advantageous disposition of stocks in companies with whose management it is not satisfied; or where it appears desirable to do so, and reinvesting the proceeds, etc.

The Supreme Court has said: "The dominant characteristic of a holding company is the ownership of securities by which it is possible to control or substantially to influence the policies and management of one or more operating companies in a particular field of enterprise." *North American Co. v. Securities and Exchange Commission,* 327 U.S. 686, 701, 66 S.Ct. 785, 90 L.Ed. 945 (1946). The Court held in that case that the appellant public utility holding company was not, as it claimed, merely a large investor, but was engaged in interstate commerce and thus subject to regulation by Congress. Noting the appellant's "very substantial stock interest and its domination as to the affairs of its subsidiaries, as well as its latent power to exercise even more affirmative influence," the Court held that it could not "hide behind the facade of a mere investor." 327 U.S. at 695, 66 S.Ct. 785.

In the instant case, the Debtor was a publicly traded corporation with majority interests in several large businesses. It had two employees. The fact that many of the Debtor's directors and officers were directors and officers of the Debtor's subsidiaries shows that the Debtor dominated, or at least influenced, its subsidiaries. The Debtor was operating a business, that business being a holding company. The Debtor's business did not cease when the Atlantis closed.

The Appellants argue that the equities of the case call for reversal. They point out that courts should construe Code provisions regarding wage priorities liberally, giving broad meaning to them. *In re Seventh Avenue South, Inc.,* 10 B.R. 289, 291 (W.Va. 1981). They further state that the Debtor acted unfairly in breaking its promise of retroactive pay raises and in creating a web of subsidiaries to shield its assets. The appellees respond that the Debtor was required to create subsidiaries to hold gaming licenses, since the Debtor, as a publicly traded company, was prohibited from doing so by New Jersey and Nevada law.

The equities do not clearly favor the Appellants. As a policy matter, it is those

employees who worked for the debtor immediately before its demise, presumably thereby enhancing its value, who deserve priority for the value that they helped create. This policy consideration does not apply to claimants such as the Appellants—employees of the Debtor who worked in a previous business venture which terminated several years before the bankruptcy. *Rau, supra,* 113 B.R. at 622. Also, the fact that the Debtor remains in business lessens any concern that it manipulated its employees to defeat the priority period. *In re Adcock Excavating, Inc.,* 42 B.R. 84, 87 (Bankr.N.D.Ill.1984). Finally, the allegation that the Debtor acted unfairly should not affect the Appellants' priority, since given the realities of bankruptcy any priority that the Appellants would obtain comes only at the expense of other creditors. *In re Sullivan Sales Corp.,* 146 B.R. 623, 626 (Bankr.W.D.N.Y.1992).

More importantly, weighing the equities of the Appellants' claims would circumvent the attempt in *Rau, supra,* 113 B.R. at 622, to simplify the determination of priority under Section 507(a)(3). A bankruptcy court's equity powers may be used only within the confines of the Code. Since the priority determination is one of statutory interpretation, *Davidson, supra,* 817 F.2d at 1123, the equities of this case are of little consequence. We will not let equity considerations in this case override the statutory considerations made in *Rau.*

## V

### CONCLUSION

After the Atlantis closed, the Debtor continued in business as a holding company. Because the Appellants' claims were for money earned more than 90 days before the Debtor filed bankruptcy and ceased doing business, the claims were not entitled to priority under 11 U.S.C. § 507(a)(3).

**AFFIRMED.**