Whitaker, Judge,
delivered the opinion of the court:
Plaintiffs sue to recover an alleged overpayment of income and excess profits taxes for the years 1944 to 1948, both inclusive, in the amount of $9,472,157.80, plus interest allowed by law. Under orders of the Securities and Exchange Commission the predecessor of plaintiff American Natural Gas Company, both hereinafter referred to as “American”, sold its stock in The Detroit Edison Company in the year 1948 at a loss. Plaintiffs, who filed consolidated tax returns for the years in question, allege that they are entitled to deduct this loss from ordinary income; whereas, the Commissioner of Internal Eevenue allowed the loss only to the extent of the capital gains.
The issue presented is whether or not plaintiffs are entitled to deduct from their ordinary income the full amount of the loss.[1]
They are entitled to do so, if at all, only by virtue of section 117(j) of the Internal Eevenue Code of 1939, as amended by the Eevenue Act of 1942. This section reads:
(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.
# * # & *
(2) General rule. If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power or requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, ex *575 ceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gams do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *
Plaintiffs say that American sold its stock in the Detroit Edison Company under compulsion of an order of the Securities and Exchange Commission, and that the loss on the sale, therefore, comes within the provision of the statute relating to a “compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property * * Such a loss is deductible from ordinary income.
There can be no doubt that the conversion of the property in question was under compulsion, and we think it was involuntary, but we do not think it comes within the sort of compulsory or involuntary conversions described in the limiting clause, which is enclosed in parentheses. It can only come within that involuntary conversion which is the result of a requisition of property or a condemnation thereof, or the threat or imminence of requisition or condemnation, and we do not think it was the result of either. American’s ownership of the property had become unlawful after the passage of the Public Utility Holding Company Act, and, because it was unlawful, it was ordered to dispose of it. Defendant did not take it at all, neither for its own use nor for the use of another, nor did it threaten to do so.
This will become apparent from a reading of the Public Utility Holding Company Act of 1935 (49 Stat. 803), and the circumstances surrounding the sale.
This Act directed the Securities and Exchange Commission to require all utility holding companies to simplify their corporate structure and to eliminate therefrom all holdings which were not necessary or appropriate to the operation of an integrated public utility system. Section 11(a) of the Act required the Commission “to examine the corporate structure of every registered holding company and subsidiary company thereof, the relationships among the companies in *576 the holding-company system of every such company and the character of the interests thereof and the properties owned or controlled thereby to determine the extent to which the corporate structure of such holding-company system and the companies therein may be simplified, unnecessary complexities therein eliminated, voting power fairly and equitably distributed among the holders of securities thereof, and the properties and business thereof confined to those necessary or appropriate to the operations of an integrated public-utility system.”[2]
Under section 11(b)(1) the Commission was charged with the duty “to require by order, after notice and opportunity for hearing, that each registered holding-company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system,; * *
Any order made thereunder was made subject to judicial review. Under subsection (c) of section 11 it was required that any order issued should be complied with within one year, subject to the right in the Commission to extend the time. Under subsection (d) of section 11 the Commission was authorized to apply to a court for the enforcement of its orders.
Acting pursuant to the authority therein granted, the Securities and Exchange Commission on March 8, 1940 issued an order for a hearing directed to American and the other holding-companies forming a part of the system. The order recited that its system was not confined to a single integrated public utility system and, accordingly, ordered that hearings be commenced and that the companies be required to file an answer. The companies answered, asserting their right to continue their operations under their *577 present system, but they nevertheless expressed a willingness to cooperate with the Commission, to avoid controversy, and, so, they proposed a plan for the disposition of certain properties of the system, and the grouping of the remaining assets into three geographical areas.
On June 13, 1941, the Commission issued a statement of tentative conclusions holding that the system as then constituted did not meet the standards of integration set out in the Public Utility Holding Company Act of 1935, and that, among other things, American’s ownership of stock in the Detroit Edison Company must be disposed of. The Commission directed that the companies show cause why an order should not be entered in conformity therewith. The companies answered, vigorously protesting the Commission’s proposed order, but the Commission, notwithstanding, on August 5, 1941, issued its decision directing, among other things, that American dispose of its Detroit Edison Company stock. The order provided that the companies should proceed “with due diligence to comply with the foregoing order, and shall make application to the Commission for the entry of any further orders necessary or appropriate for that purpose.” Jurisdiction was retained for the entry of such orders as might seem necessary and appropriate.
The companies submitted their first plan on November 1, 1944, some three years later, and applied for its approval, but this was refused by the Commission on June 2,1945.
On June 26,1947, the companies filed another plan, known as Application 31. On September 2, 1947, the Commission delivered its opinion, in which it stated that the plan appeared to be deficient in not providing for prompt compliance with the original order of August 5, 1941. Thereupon, the companies filed an amendment to the plan on September 18,1947. Hearings on this amended application were ordered.
On October 28, 1947, the companies filed a second amendment to the application, in which it was stated that the Detroit Edison stock would be disposed of by December 31, 1948, and proposed an immediate sale of 450,000 shares thereof. On November 19, 1947, the Commission issued an *578 order in which it authorized the sale of the 450,000 shares of Detroit Edison stock.
Then, on December 30, 1947, the Commission entered an order approving application No. 31, as amended. It directed, among other things, that the Detroit Edison stock be disposed of, 450,000 shares in December 1947, 400,000 shares in May 1948, and 250,000 shares in October 1948, the balance to be distributed to the stockholders as dividends. In the meantime American had received a stock dividend from Detroit Edison of 128,920% shares; the Commission ordered that these shares be disposed of in conformity with its order of August 5,1941.
American sold 450,000 shares of the Detroit Edison stock in January 1948 at a price of $19.06 a share; in April 1948 it sold another 450,000 shares at a price of $19.73 a share; in August 1948 it sold 190,000 shares at a price of $20.01 a share; and in November 1948 it sold 192,734 shares at a price of $19,546 a share. The balance of the stock was distributed to its stockholders.
Plaintiffs say these sales were involuntary conversions which resulted from “an exercise of the power of requisition or condemnation or the threat or imminence thereof,” as these words are used in section 117 (j), sufra. Plaintiffs concede that in order to receive the tax benefits of section 117(j), a compulsory or involuntary conversion must be one which results from one of those things mentioned in the parenthetical clause of that section, in this case, requisition or condemnation or the threat thereof; but they argue, first, that the order of divestment issued by the Securities and Exchange Commission was an exercise of the power of requisition or condemnation; or, in the alternative, they say, since the Act empowered the Commission to apply to a court to appoint a receiver to take over the assets of the company and enforce the order, that the order amounted to a threat to requisition or condemn the property.
We cannot agree. The order of the Securities and Exchange Commission was neither a requisition nor a condemnation, nor the threat of either. It was nothing more than an order by the Commission for plaintiffs to dispose of property the possession of which by plaintiffs was prohibited by the *579 Public Utility Holding Company Act. It was an order for plaintiffs to comply with the law. The Act required that “the properties and business thereof ;[of a public utility system] be confined to those necessary or appropriate to the operations of an integrated public utility system”; the Commission thought that American’s ownership of the Detroit Edison Company stock was not necessary for this purpose; and, so, it required American to dispose of that the possession of which by it was no longer lawful.
By no means can this be considered an exercise of the power of eminent domain. The United States did not take the property; it did not take it for public use or for any use at all. On the contrary, in ordering the sale of the stock, Congress was exercising, through the Securities and Exchange Commission, its constitutional power to regulate interstate commerce. The Supreme Court has held that the Public Utility Holding Company Act of 1935, which authorized such an order, was a valid exercise of such power. American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90; North American Co. v. Securities and Exchange Commission, 327 U.S. 686; Electric Bond & Share Co. v. Securities and Exchange Commission, 303 U.S. 419.
The purpose of the Act was to eliminate the evils then existing in public utility holding companies, and to protect the public from the abuses inherent in them as they were then constituted. It was an Act to promote the public welfare. It was no part of its purpose to condemn or to requisition the companies’ property. The Supreme Court, in North American Company v. Securities and Exchange Commission, supra, said that “Congress enacted the Public Utility Holding Company Act of 1935, 49 Stat. 803, in order to correct grave abuses which it had found in the use of the holding-company device in the nation’s electric and gas utilities industries.” It further said at pp. 705-6:
This broad commerce clause does not operate so as to render the nation powerless to defend itself against economic forces that Congress decrees inimical or destructive of the national economy.
$ $ ❖ * *
Congress in § 31(b) (1) of the Public Utility Holding Company Act was concerned with the economic evils *580 resulting from uncoordinated and unintegrated public utility holding company systems. These evils were found to be polluting the channels of interstate commerce and to take the form of transactions occurring in and concerning more states than one. Congress also found that the national welfare was thereby harmed, as well as the interests of investors and consumers. These evils, moreover, were traceable in large part to the nature and extent of the securities owned by the holding companies. Congress therefore had power under the commerce clause to attempt to remove those evils by ordering the holding companies to divest themselves of the securities that made such evils possible.
In the exercise of its regulatory powers Congress, of course, must act within the limits imposed by the Constitution. If it exceeds these limits by taking private property without due process, then the regulatory statute is invalid. In the North American case, supra, the petitioner argued that section 11(b) (1) of the Public Utility Holding Company Act of 1935 was unconstitutional, in that it amounted to a taking of private property. The Court answered this at 327 U.S. 709 by stating:
* * * there is no basis here for assuming that in limiting the scope of North American’s operations there will be dispositions of securities for inadequate considerations, thereby raising a question as to whether there is a destruction of these values without just compensation. The Act does not contemplate or require the dumping or forced liquidation of securities on the market for cash. Under §§11 (d) and 11 (e) of the Act, any divestment or reorganization plan must meet the standards of fairness and equitableness. In many instances this may involve no more than a distribution of the securities among the existing shareholders of the holding company. But should securities be sold for cash, speculation as to unfavorable market conditions cannot undermine the validity of § 11(b) (1). * * *
There is no contention that in the case at bar the securities had to be sold for less than their market value at the time of the sale.
The Public Utility Holding Company Act does not differ in principle from many other statutes that prohibit the possession of things which the legislative authority considers inimical to the public welfare; for instance, narcotics, *581 whisky, firearms, property that is unsafe or unsanitary, or otherwise a nuisance, etc.
In Mugler v. Kansas, 123 U.S. 623, it was argued that a Kansas prohibition statute constituted a taking of private property without just compensation, as required by the due process clause of the 14th Amendment. The Court, at pages 668-9, said:
As already stated, the present case must be governed by principles that do not involve the power of eminent domain, in the exercise of which property may not be taken for public use without compensation. A prohibition * * * upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. * * * The power which the states have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not — and, consistently with the existence and safety of organized society, cannot be — burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner.
See also Union Bridge Co. v. United States, 204 U.S. 364 (alterations of a bridge over a navigable stream); Samuels v. McCurdy, 267 U.S. 188 (making unlawful the possession of liquor purchased before the passage of the 18th Amendment) ; Corneli v. Moore, 257 U.S. 491 (prohibiting the transfer of liquor from the Government-bonded warehouse to the dwelling of the owner); United States v. Caltex, 344 U.S. 149 (destruction of property to prevent capture by the enemy); and United States v. Central Eureka Mining Co., 357 U.S. 155 (a prohibition on the mining of gold during a *582 war emergency). In none of these cases was it held that there was a requisition or condemnation of the property.
Plaintiffs say that the term “requisition or condemnation” as used in the Act means something more than the exercise of the power of eminent domain. We do not think it does. It seems clear to us that the words mean the taking or the threat of taking property by some public or quasi-public corporation — by some instrumentality that has the power to do so against the will of the owner, and for the use of the taker. That is the common, well-recognized meaning of those words and there is nothing to indicate that Congress used them in any other sense. Plaintiffs were required to dispose of their property, but the United States did not take it, nor did it prevent plaintiffs from getting for it its full market value at the time of the taking.
Section 112(f) of the Internal Eevenue Code of 1989 uses the same words as those with which we are concerned. Such a provision first appeared in the Eevenue Act of 1921. They were used to take care of situations resulting from the sinking of ships by submarines or their requisition by the Government for its use, as is shown by the letter of the Secretary of the Treasury to the Committee on Ways and Means when the Eevenue Act of 1918 was under consideration. It read, in part:
During the war, in the case of property requisitioned for war purposes by the Government and property lost or destroyed in whole or in part, through war hazards, especially in the case of ships, it happened that at the time of the requisition or loss the market value of such ships was considerably increased over the cost * * * and that in practically no case would the taxpayer have been willing to sell the property for its appraised value at the time of requisition or loss.
To require the taxpayer to pay income and war profits and excess profits taxes upon the difference between the cost * * * and the compensation received at the time of requisition or loss would have been to take such a large proportion of the amount received for the vessel that, although the owner desired to replace the same, the taking of the tax by the Government would have made it impossible in practically every instance.
*583 This shows that when Congress set about to take care of situations arising from the involuntary conversion of property by destruction or the taking of it for governmental use, it used the words with which we are here concerned. This tends to support the view that Congress had in mind requisitions or condemnations under the power of eminent domain.
The Tax Court so understood these words in 112(f). See Dear Publication & Radio, Inc. v. Commissioner, 81 T.C. 1168. In a previous case, in Credit and Investment Corp. v. Commissioner, 47 B.T.A. 673, it also had so construed the words.
In the Dear Publication & Radio case there was involved a New Jersey statute which required the dissolution of a corporation in case of a deadlock among the management. In order to prevent this dissolution, the taxpayer sold his stock in the corporation. He claimed that this was an involuntary conversion through requisition or condemnation or the threat thereof within the meaning of 112 (f). The Court of Appeals for the Third Circuit affirmed the Tax Court, holding that a sale under such conditions was not an involuntary conversion “under threat or imminence of requisition or condemnation.” Dear Publication & Radio, Inc. v. Commissioner, 274 F. 2d 656.
Plaintiffs say that the threat to resort to court for the appointment of a receiver, in case of failure to comply with the Commission’s order, was a threat to requisition its property; but, manifestly, this is not so. The purpose of the appointment of a receiver was to force compliance with the Commission’s order, not to take the property for public use. The order was issued to carry out the mandate of an Act passed pursuant to the power of Congress to regulate commerce, not under the power of eminent domain. Once the order was complied with and assurances given of future compliance, the property, or the amount received from a sale of any part of it, would be returned to its owner. No part of it was or would be taken for public use. None of it was requisitioned or condemned.
It results that plaintiffs’ petition must be dismissed.
It is so ordered.
*584 Littleton, Judge (Bet.); Laramore, Judge; Madden, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT[1]
TIi® court, haying considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff American Natural Gas Company (hereinafter referred to as “American”) is a New Jersey corporation. Prior to June 15,1949, its name was American Light & Traction Company. For each of the calendar years 1944 and 1945, American, along with a group of affiliated corporations, filed consolidated Federal excess profits tax returns, and for each of the years 1944 to 1948, inclusive, filed consolidated Federal income tax returns, and paid the taxes therein shown to be due. The affiliated group consisted of the named plaintiffs in this action and two other corporations which have since been dissolved.
2. On and prior to August 5, 1941, American was a subsidiary company of The United Light and Railways Company (hereinafter referred to as “Railways”) and of United American Company, both of which corporations were, in turn, subsidiary companies of The United Light and Power Company (hereinafter referred to as “Power”) as the term subsidiary company is defined in section 2(a)(8) of the Public Utility Holding Company Act of 1935 (hereinafter referred to as the “act”), title 15 U.S.C. § 79 et seq. American was itself a holding company and owned controlling interests in a number of public utility companies, as the terms public utility company and holding company are defined in sections 2(a) (5) and 2(a) (7) of the act. American also had substantial stock interests in other companies. In 1937 and 1938, American, Railways, United American Company and Power all registered as holding companies under section 5 of the act. All such holding companies and their subsidiary companies were members of The United Light and *585 Power Company holding company system, as that term is defined in section 2 (a) (9) of the act.
3. On and prior to August 5, 1941, American was the owner of 1,289,205 shares of the common stock of The Detroit Edison Company (hereinafter referred to as “Detroit Edison”) , comprising approximately 20.3 percent of the common stock of that company.
4. On March 8,1940, the United States Securities and Exchange Commission (hereinafter referred to as the “Commission”) commenced proceedings against Power and the other members of its holding company system, including American, to determine what action such companies should be required to take to limit the operations of the holding company systems of each of the respondent registered holding companies to a single integrated public utility system, as required by section 11(b) (1) of the act.[2] The Commission’s Notice and Order for Hearing alleged in part that:
55. The holding-company system of said The United Light and Power Company is not confined in its operations to those of a single integrated public utility system within the meaning of the Act, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system.
The Commission’s order directed Power and each of its subsidiary companies to file joint or several answers “admitting, denying or otherwise explaining their respective positions” as to each of the allegations.
5. On or about May 2, 1940, Power and its subsidiaries, including American, filed a joint Answer to the Commission’s Notice and Order for Hearing, alleging that the Power holding company system satisfied the requirements of section 11(b)(1) and that:
Each of the answering respondents which is a registered holding company states that it has a right to continue to control the public utility companies now subject to its control and each of said respondents which *586 holds an interest in any business (other than the business of a public utility company as such) states that it has the right to retain such interest.
The Answer of Power and its subsidiaries expressed a willingness to avoid controversy as to the meaning and validity of section 11 of the act and to that end proposed certain plans and procedures for the simplification of the Power holding company system. Such plans included the disposition of certain properties and the grouping of the remaining utility properties into three geographical areas. After stating that properties to be retained in the third area included gas distribution facilities in the State of Michigan plus certain gas transmission and production facilities, the Answer continued:
It is contemplated that the investment of the holding company system in The Detroit Edison Company will be retained. If it should be finally determined that The Detroit Edison Company is a subsidiary of the Company the Third Area would include the operations of that company.
6. On June 13, 1941, the Commission issued a Statement of Tentative Conclusions as to action which should be taken by the Power holding company system under the provision of section 11(b) (1) of the act. In its discussion of American’s stock interest in Detroit Edison, the Commission stated as follows:
In addition to its subsidiaries, American Light & Traction Company has a major investment in The Detroit Edison Company, comprising approximately 20.6% of the common stock of that company. We have held, upon application of The Detroit Edison Company, that the latter company is not a subsidiary of American Light & Traction Company, or of The United Light and Railways Company, or of The United Light and Power Company.
With respect to the investments of American Light & Traction in Detroit Edison Company and in International Paper and Power Company, we have already decided (The United Gas Improvement Company, Holding Company Act Release No. 2692) that investments in utility companies which are not subsidiaries may be retained only where such investments are reasonably inci *587 dental or economically necessary or appropriate to the operations of the holding company’s utility subsidiaries. It is our tentative opinion that the investment in stock of Detroit Edison Company does not meet this statutory standard and accordingly must be disposed of. * * *
The Commission’s order then directed that hearings be held, at which the Power holding company system would be given an opportunity to show cause why an order should not be entered pursuant to section 11(b) (1) of the act requiring, among other things:
(b) The elimination from the holding company system of American Light & Traction Company of all of the properties of said system other than those located, in Michigan and Wisconsin, and particularly requiring the disposition of the interest of said holding company system in San Antonio Public Service Company, American Coal Company, South Tesas Ice Company, Detroit Edison Company and International Paper and Power Company.
7. On July 14, 1941, Power and its subsidiary companies, including American, filed with the Commission an Answer to the Commission’s Order of June 18, 1941, requiring respondents to show cause why certain orders should not be entered pursuant to section 11(b) (1) of the act. With respect to the Commission’s proposed order directing American to dispose of its interest in Detroit Edison, the Answer stated as follows:
7. The proposed requirement of Paragraph (b) of the order of June 13, 1941 for disposing of the interest of American Light & Traction Company in Detroit Edison Company is further objectionable because said company is not a subsidiary of American Light & Traction Company (as has been heretofore determined by the Commission) and the interest of American Light & Traction Company is simply that of an investor in the stock of said company. The respondents represent, first, that there is no provision in the Public Utility Holding Company Act of 1935 making it unlawful for American Light & Traction Company to retain said investment or authorizing the Commission to order such investment disposed of; second, that the holding of such investment does not constitute a part of the operations of the holding company system of American Light & Traction Company; third, that the retention of such investment is *588 reasonably incidental, economically necessary and appropriate to the operations of American Light & Traction Company and that it is necessary and appropriate that such investment be retained in the public interest and for the protection of investors and consumers, and such retention is not detrimental to the proper functioning of the holding company system of American Light & Traction Company. The respondents further represent that the tentative conclusion of the Commission that said investment in Detroit Edison Company cannot be retained by American Light & Traction Company has not been based on an adequate consideration of either the facts or the law which should govern the action of the Commission, or the injurious consequences of the proposed order, particularly in view of present extraordinary economic conditions.
8. On August 5, 1941, the Commission issued its opinion and order directing certain action to be taken by the companies of the Power holding company system under section 11(b) (1) of the act. In its opinion, the Commission considered at length American’s contention that the Commission should permit American to retain its ownership of Detroit Edison common stock, concluding that:
Applying the interpretation of the law as set forth in the United Gas Improvement; Company case, and for the reasons hereinbefore set forth, we can not find that the retention of the stock in the Detroit Edison Company is reasonably incidental or economically necessary or appropriate to the operations of any of the public utility subsidiaries of the American Light & Traction Company. Accordingly, therefore, we conclude that this investment must be disposed of, and our order will so provide.
* * * ifc #
It is, of course, obvious that methods exist by which The United Light and Railways Company might eliminate from its holding company system the subsidiaries of American Light & Traction Company other than by sale of the common stock of the latter company.
*****
We need not at this time consider the steps which should be taken by The United Light and Railways Company and by The United Light and Power Company to eliminate from their holding company systems the subsidiaries of American Light & Traction Com *589 pany. It is sufficient that we now find that such action is required under the terms of Section 11(b)(1). Whether such action should be accomplished by cash sales, by exchanges of securities, by distribution to existing security holders, or otherwise, and the time and manner thereof, we leave for further determination at an appropriate time. If difficulties present themselves which render compliance impossible during the year following our order, we will at the appropriate time give consideration thereto in connection with any application by the respondents for additional time to carry out the Commission’s order pursuant to Section 11 (c).
The Commission’s Order of August 5,1941, provided in part as follows:
rr is hereby ordered, pursuant to Section 11(h) (1) of the Public Utility Holding Company Act of 1935, that:
# * * *
2. American Light & Traction Company shall dispose of its interests in San Antonio Public Service Company, American Coal Company, South Texas Ice Company, The Detroit Edison Company, and International Paper and Power Company, and in the properties and assets owned or operated thereby;
$ $ $ $ $
it is further ordered that the respondents shall proceed with due diligence to comply with the foregoing order, and shall make application to the Commission for the entry of any further orders necessary or appropriate for that purpose; the respondents shall submit to the Commission for its approval in these proceedings appropriate applications or declarations for the purpose of complying with the various provisions of this order in accordance with the applicable standards of the Act; and jurisdiction is hereby expressly reserved to enter such orders in these proceedings as may be necessary or appropriate for the purpose of carrying out the provisions of this order.
it is further ordered that jurisdiction be and is hereby reserved to enter such further orders as may be necessary or appropriate with respect to any of the remaining issues in these proceedings and particularly for the purpose of determining what action should be ordered to be taken by the respondents pursuant to Sections 11(b) (1) and 11 (b) (2) of the Act, and for that purpose jurisdic *590 tion is reserved to reconvene the hearings herein upon such notice as the Commission shall deem appropriate.
9. Thereafter, pursuant to the provisions of the Commission’s Order of August 5, 1941, directing respondents to “submit to the Commission for its approval in these proceedings appropriate applications or declarations for the purpose of complying with the various provisions of this order,” the members of the Power holding company system made a series of applications to the Commission to carry out specific provisions of the Commission’s Order of August 5,1941. On November 1,1944, American and Railways filed an application with the Commission known as Application No. 21. That application provided for the liquidation and dissolution of American in two major steps. The first step was the payment to preferred stockholders of American of cash in an amount equal to the par value of the outstanding preferred stock ($25 per share); the second step involved the consummation of a number of preliminary transactions, after which the remaining assets of American would be distributed in kind among its common stockholders. Among the preliminary transactions contemplated by Application No. 21 was the organization of a new company to construct, own, and operate a natural gas pipeline from Texas and Oklahoma to Michigan and Wisconsin. The Application proposed that “the greater portion of American Light’s investment in the Common Stock of The Detroit Edison Company will be utilized in financing the project” and that a smaller amount might be used to repay temporary loans which would provide a portion of the cash needed to retire American’s preferred stock.
10. By an Amended Application filed December 22,1944, American made the following statement:
Consummation of the foregoing transactions is not a condition precedent to the complete liquidation of American Light. It is the intention of the management to distribute the common stocks of Michigan Consolidated Gas Company, Milwaukee Gas Light Company and Madison Gas and Electric Company to the Common stockholders of American Light as soon as practicable, whether or not the foregoing transactions have been completed.
*591 11. On March 12, 1945, the Commission issued a Statement of Tentative Views with regard to Amended Application No. 21, in which it stated the following tentative conclusions, among others:
f. That the Detroit Edison stock owned by American Light may not be retained by it or any subsidiary company for future use in connection with the possible pipe line construction. If it appears that the pipe line construction is sufficiently imminent to warrant setting aside assets of the American Light system to provide for it at this time, American Light may file appropriate applications providing for the donation of cash to Michigan Consolidated or a new pipe line company, as set forth in the previous paragraph.
g. That, in the light of all the foregoing, the most appropriate plan for accomplishing compliance with our order of August 5,1941 would be as follows:
*****
rt. Sale or other divestment of the Detroit Edison stock; if construction of a pipe line as a war emergency measure is to be undertaken, appropriate applications may be filed providing for donation to Michigan Consolidated or to a new pipe line company of proceeds of sale.
^ ‡ ^ $
h. That unless Railways and American Light amend the pending plan in conformity with the foregoing, the Commission must proceed promptly with enforcement pursuant to Section 11(d) of the Act and reconvene the hearings to consider the precise provisions of a plan, embodying the principles stated hereinabove, which would be adopted by the Commission under Section 11(d).
(22) We also conclude that unless Railways and its subsidiary, Continental, act promptly to dispose of their interest in Columbus, as required by our order of August 5, 1941, we must apply to an appropriate court to enforce our order. In this connection, we do not express any views as to the method of disposition except that the process of disposition must result in a corresponding decrease in Continental’s outstanding senior securities.
12. Pursuant to the Commission’s Statement of Tentative Views, American and Railways on March 25, 1945, filed a *592 Counterstatement. This Coimterstatement contained an excerpt from a communication written by American and Railways to its stockholders to the following effect:
In addition, I wish to point out that the Commission gives your management great latitude in carrying out its requirements. No particular method of procedure is prescribed. On the contrary it specifically leaves open for future determination the action necessary for compliance, whether by cash sales, exchanges of securities, distribution to existing security holders or otherwise.
Your management does not intend to appeal from this order, but will meet this situation in the utmost good faith and believes that it can rearrange the affairs of your Company in compliance with the terms of the order without imposing undue sacrifices on the part of security holders.
The Counterstatement also provided:
The latter part of the Commission’s first tentative conclusion relates to the disposition by American Light of its interest in Detroit Edison and the Commission apparently feels that such stock should have been disposed of by this time. The management concedes that the stock could have been sold, but such a sale would have been considered as reckless action if it had been made before the proceeds could be distributed to stockholders or profitably reinvested for their benefit. It must be remembered that the fate of American Light had not been determined by the Commission in its order of August 5, 1941, and that the Preferred Stock of American Light is a noncallable security. Furthermore, American Light, because of its advantageous sale of San Antonio Public Service Company, is already possessed of a substantial amount of idle cash.
* * * * *
Such an advance sale of Edison Stock is not necessary to enable American Light to complete its liquidation promptly because, as already indicated, the Edison Stock could be transferred to the pipe line company, the pipe line company stock could be transferred to Michigan Consolidated or to that company and Milwaukee Gas and Madison jointly, and the stocks of those companies could be distributed immediately to the Common stockholders of American Light.
*593 572
13. On June 2,1945, tibe Commission issued its Memorandum Opinion regarding Amended Application No. 21, in which, it stated in part as follows:
It should not have come as a surprise to the management at this time, nearly four years from the date of the divestment order of August 5, 1941, that the Commission should express, at least tentatively, its views on the fundamental problems involved in complying with our order under Section 11. :|! * * It is clear that our 1941 order was issued without any expectation on our part that, after four years, compliance therewith would be delayed or complicated by a proposal to enter into a wholly new business venture of such great magnitude as is presented by the pipe line project.
*****
As a further consequence of our views with respect to the pipe line project, hereinabove discussed, we find that the Detroit Edison stock owned by American Light may not be retained for future use in connection with the possible pipe line construction. Because of the remoteness and uncertainty of such construction, further retention of Detroit Edison will merely afford the management a continuing opportunity for speculation as to the future market for the sale of such investment which we directed Railways and American Light to dispose of by our order of August 5,1941.
^ s|i
The sale of Detroit Edison will provide American Light with funds which will be available to be used in effecting the retirement of its preferred stock. With this source of cash in sight and m view of the fact that American Light is to liquidate and dissolve promptly, we cannot approve the proposed bank loan. Our decision in this regard, however, is without prejudice to the subsequent filing of an appropriate application for a temporary bank loan if need therefor should arise in connection with a plan for the sale of Detroit Edison and the payment of American Light’s preferred stock.
^ & ífc «I»
In the light of the foregoing and of the entire record before us, we conclude that the most appropriate plan for accomplishing compliance with our order of August 5,1941 would be as follows:
(i) Discharge of the claims of the outstanding American Light preferred stock out of the presently available *594 resources, including the proceeds from the sale of all or a part of the Detroit Edison stock, by the immediate payment of an amount of cash equivalent to the par or liquidating value of such stock, with an appropriate deposit of cash in escrow for the payment of the balance, if any, of the amount which may be determined to be payable to preferred stockholders.
(n) Sale or other divestment of the balance of the Detroit Edison stock immediately; if it is desired that Michigan Consolidated be put in a position to render assistance in financing possible additional gas supply, the plan for the liquidation and dissolution of American Eight may include appropriate provisions for the donation of cash proceeds from the sale of Detroit Edison to Michigan Consolidated.
$ $ $ $ $
Not being otherwise persuaded by the counterstate-ments and oral argument we adopt as our finding our tentative conclusion, appearing in Paragraph 21 (h) of our Statement of Tentative Views, that unless Railways and American Light amend the pending plan in conformity with the foregoing, the Commission must proceed promptly with enforcement pursuant to Section 11(d) of the Act and reconvene the hearings to consider the precise provisions of a plan, embodying the principles stated hereinabove, which would be adopted by the Commission under Section 11(d). Accordingly, the staff is instructed to proceed immediately to draft a plan in conformity with the views stated hereinabove. We shall propose a plan at the end of a thirty-day period from the date of this memorandum opinion (or of such extended period as may be granted by subsequent order) unless prior to the expiration of such time Railways and American Light shall have amended the pending plan in conformity with the views stated herein. Thereafter, a notice will issue reconvening the hearings to consider such amended plan as may be filed within the specified period by Railways and American Light under Section 11(e), or to consider the plan proposed by the Commission and any other plan that may be submitted by any person having a bona fide interest in the reorganization in order to determine the precise provisions of a plan to be adopted under Section 11 (d). The hearings so to be convened will be directed initially to the consideration of a plan for effecting compliance with our order of August 5, 1941 conforming to our view stated herein, irrespective of any other plan or plans now pending or that may be hereafter presented.
*595 14. On July 2, 1945, American and Railways filed their First Amendment to Amended Application No. 21, in order to conform the plan to the requirements of the Commission’s Opinion of June 2,1945. The application stated as follows with respect to American’s investment in Detroit Edison:
The Amended Plan required American Light to sell for cash such number of shares of Common Stock of Detroit Edison as shall be necessary to enable American Light to pay its debts, liabilities and expenses and to make the deposits required to pay and protect the interests of the Preferred stockholders. In this connection, American Light reserves the right to request authority to make a temporary bank loan, if need therefor should arise pending the sale of Detroit Edison stock.
The Amended Plan provides that the shares of Detroit Edison stock not required to be sold to carry out the Plan and all shares of Common Stock of Michigan Consolidated Gas Company (Michigan Consolidated), Milwaukee Gas Light Company (Madison) shall be distributed pro rata to the Common stockholders of American Light.
15. On April 30,1946, the Commission issued findings and an opinion finding that Amended Application No. 21 should not be approved because the amount to be paid per share of preferred stock was inadequate. Before issuance of an order with respect thereto, the Commission, on July 1, 1946, ordered reargument of the matter. Reargument was subsequently held on August 6, 1946, but no further opinion or order regarding Application No. 21 was issued by the Commission.
16. In February of 1947, prior to disposal by American of its Detroit Edison stock, Detroit Edison declared its intention to declare and pay a common stock dividend of 10 percent on its outstanding shares of common stock. American accordingly filed an application, designated Application No. 30, for authority to receive an additional 128,92014 shares of Detroit Edison common stock, representing and agreeing that such additional shares would be held subject to the provisions of the Commission’s Order of August 5, 1941. By order of March 20, 1947, the Commission approved American’s receipt of such additional shares of Detroit Edison common stock subject to the condition that they should be held *596 subject to the terms of the Order of August 5, 1941. Upon distribution by Detroit Edison of the stock dividend on May 1,1947, the total number of shares of Detroit Edison common stock held by American was increased to 1,418,125% shares.
17. Subsequently, on June 26, 1947, American and Railways filed with the Commission, in substitution for Application No. 21, a new application designated Application No. 31. Application No. 31 recited the fact that, on November 30,1946, the Federal Power Commission had issued a certificate of public convenience and necessity authorizing Michigan Wisconsin Pipe Line Company, a subsidiary of American, to construct its proposed natural gas pipeline from Texas to Michigan and Wisconsin. Application No. 81 therefore proposed that American should continue in existence as a registered holding company owning an integrated gas utility system. Application No. 31 further proposed that:
2. When the plan is approved., American Light will discontinue the payment of cash dividends on its common stock and commence the payment of dividends in Detroit Edison stock. It is contemplated that the market value of Detroit Edison stock distributed (plus cash paid in lieu of fractional shares) will approximate the corporate net income applicable to the common stock of American Light during the period in which dividends are paid in this manner.
3. To the extent which may be necessary, resources and credit of American Light will be utilized to assist in financing the new pipe line system. The common stock to be issued by the two pipe line companies will be retained in the integrated system and senior securities of those companies will be issued to others. Construction funds will be needed by the pipe line companies at various intervals and the funds to be invested by American Light in the pipe line enterprise will be provided (a) from cash now on hand, (b) from cash accumulated by virtue of the discontinuance of cash dividends on common stock and (c) from the sale of shares of Detroit Edison stock.
4. To protect the preferred stockholders of American Light by maintaining at all times a high ratio of earnings to preferred stock dividend requirements, the shares of Detroit Edison stock not distributed as dividends or sold for pipe line purposes and the stock of Madison Gas and Electric Company will be retained during the period *597 the pipe line is under construction and no earnings are accruing from that source. When earnings from the pipe line commence to accrue, an additional amount of Detroit Edison stock will be sold to provide funds to meet the reasonably foreseeable needs of American Light and its subsidiaries, and such stock of Detroit Edison as may then remain, together with the common stock of Madison Gas and Electric Company, will be distributed pro rata to the common stockholders of American Light.
5. As soon as practicable after the plan is approved, Railways will sell or otherwise dispose of all shares of preferred stock of American Light held by it. Railways will also promptly sell or otherwise dispose of all shares of Detroit Edison and Madison Gas and Electric Company received by it in distributions made by American Light. The manner in which such sales or other dispositions are to be made shall be subject to the approval of the Commission.
18. Shortly after Application No. 31 was filed, intervenor Allied Chemical & Dye Corporation filed a petition requesting that the Commission apply to a court under section 11(d) of the act to enforce compliance with the Commission’s Order of August 5, 1941. American and Railways thereupon filed an answer and motion to dismiss, following which the Commission, on September 2, 1947, issued an opinion and order denying Allied’s petition and directing that hearings be held with respect to Application No. 31. In the course of its opinion, the Commission stated:
Under the provisions of the plan submitted in Application No. 31, the time within which steps are to be taken to comply with our order requiring the divestment by American of its interest in Detroit Edison and the complete severance of Railways from the American system is not specifically indicated and depends substantially upon the completion of the pipe line project and its profitable operation. While the plan does provide for a gradual distribution by American of Detroit Edison stock and by Railways of American stock as dividends in lieu of cash, and for the sale by American from time to time of Detroit Edison stock to finance construction, it does not appear from the plan, in its present form, that there is any intention to effect complete compliance with our 1941 order unless and until the pipe line has become a profitable going enterprise. Moreover, since the pipe line project is still in a preliminary stage and is sub *598 ject to certain contingencies, it does not appear from tlie face of the plan that there is any assurance that there will be full compliance with our order within the foreseeable future.
Our objective is to achieve expeditious compliance with the Act in a manner which is fair and equitable to all security holders affected. The merits of the pipe line project, as such, are notj of course, in issue here. However, questions of financing and ownership of the pipe line must not be resolved in a manner which promises substantial delay in compliance with our order of August 5,1941, directing American Light to dispose of its interest in Detroit Edison and directing Railways to dispose of its interests in American Light’s subsidiaries.
The Commission concluded that, while the plan appeared to be deficient in failing to provide assurance that there would be prompt compliance with the 1941 Order, the applicants should have an opportunity to correct such defects and to present evidence elaborating their proposal.
19. On September 18, 1947, American and Railways filed a First Amendment to Application No. 31, which added the following provision to the Plan, among others:
11. Notwithstanding any other provision of the Plan:
(a) American Light shall dispose of all shares of common stock of Detroit Edison and Madison Gas and Electric Company held by it; * * * within two years from the effective date of the Plan. For this purpose the effective date of the Plan shall be the date upon which the Commission enters its order approving the Plan, unless Railways and American Light shall be prevented from carrying out the Plan by court order, in which event the effective date shall be the date upon which such court order is vacated, set aside or otherwise becomes inoperative.
20. At the conclusion of applicants’ evidence, the Commission’s staff moved to disapprove Application No. 31 on the ground that the proposed plan did not provide for prompt and expeditious compliance with section 11(b) of the act and the Commission’s Order of August 5,1941. By Opinion issued October 15, 1947, the Commission denied the staff’s motion to disapprove Application No. 31 without prejudice to its renewal upon submission of the entire case. In the *599 course of its opinion, the Commission indicated that the proposed 2-year period for disposition by American of its Detroit Edison stock had not been justified, stating in part:
The justification offered for postponing the divestment of Detroit Edison by American is somewhat different, although that divestment, too, is said to be tied to the projects to be constructed under the plan. Since the plan provides for using proceeds from the sale of some of the Detroit Edison stock to finance American’s equity interest in the projects, it is proposed to dispose of the stock only as capital is needed, thereby retaining for as long as possible the earnings of the Detroit Edison stock. Here again we think the asserted justification is inadequate. It would appear entirely possible to proceed promptly with divestment of the Detroit Edison stock without jeopardizing the proposed financing; nor would such divestment necessarily result in the retention for any substantial period of any large amounts of unproductive cash. In this connection, it is enough merely to point out that if the entire program were accelerated, including the retirement of American’s preferred so as to reduce that fixed charge, the importance of the Detroit Edison revenue would be lessened, and the cash realized from its sale could be put to immediate use.
In passing upon the single issue raised by the staff’s motion as to whether we can accept the additional two year delay in compliance with our 1941 order now contained in applicants plan for disposing of Railway’s interest in American, and American’s interest in Detroit Edison, we are not unmindful of other problems involved in carrying out such divestments. We recognize that adequate provision must be made for the preferred stockholders of American before Detroit Edison can be distributed to American’s common stockholders, and that adequate provision must be made for the senior security holders of Railways if there is to be a distribution of the American stock to Railways’ common stockholders. There is also the problem of putting to use idle cash received from the sale of portfolio securities until needed in the various projects proposed by the plan. However, we have taken these problems into account in considering the reasons which have been advanced to justify the proposed additional two year delay in compliance with our 1941 order, and we are not persuaded that any such additional period is necessary. We believe that the required dispositions can be accomplished much more expeditiously without *600 compromising the rights of security holders and without substantial harm to the applicants. We are not, at this time, prepared to fix a precise schedule for that purpose. The Commission’s function under the statute is to ensure that the provisions of the Act are being complied with and that such compliance is as rapid and as expeditious as the circumstances will permit, consistently with fair treatment to all concerned. But under Section 11(e) it is for the management initially to propose, within the limits set by the statute, how the dispositions will be made and how the proceeds of such dispositions can be most efficiently used.
21. On October 28, 1947, American and Railways filed a Second Amendment to Application No. 31 to provide in part as follows:
2. During the year 1948, American Light will discontinue the payment of cash dividends on its common stock and begin to pay dividends on such stock in Detroit Edison stock. Such dividends will be paid quarterly on the basis of one share of Detroit Edison stock for each 75 shares of American Light common stock.
3. To the extent which may be necessary, resources and credit of American Light will be utilized to assist in financing the new pipe line system. The common stock to be issued by the two pipe line companies will be retained in the integrated system and senior securities of those companies will be issued to others. Construction funds will be needed by the pipe line companies at various intervals and the funds to be invested by American Light in the pipe line enterprise will be provided (a) from cash now on hand, (b) from cash accumulated by virtue of the discontinuance of cash dividends on common stock and (c) from the sale of shares of Detroit Edison stock. To this end and without making further application to the Commission:
(i) From time to time as funds are needed for the construction of its proposed pipe line, Michigan-Wisconsin shall have authority to issue and sell up to 250,000 shares of its common stock (par value $100 per share) to American Light, which shall have authority to purchase such shares for cash at the par value thereof;
(ii) Michigan Consolidated shall have authority to issue and sell 285,714 shares of its common stock (par value $14 per share) to American Light, which shall have authority to purchase such shares for cash at the par value thereof; * * *
*601 (vi) Immediately upon receiving an order of approval of the Commission therefor, American Light shall proceed to sell 450,000 shares of common stock of Detroit Edison. The net proceeds derived from such sale will be invested in the common stock of Michigan-Wisconsin and Michigan Consolidated pursuant to clauses (i) and (ii) of this paragraph or used to reimburse the treasury of American Light for other funds so invested. In connection with such sale, American Light shall have authority to purchase on the New York Stock Exchange a limited number of shares of Detroit Edison in order to facilitate the distribution and offering of said 450,000 shares. American Light shall notify the Commission at least five days before purchasing any such shares of the maximum number of shares which may be purchased and of the procedure to be followed in effecting such stabilization. Unless the Commission shall otherwise direct, American Light, upon the expiration of said five-day period, shall be authorized to purchase the number of shares set forth in said notice for the purposes stated above.
The various companies named in the foregoing clauses (i) to (vi) shall have authority to consummate the foregoing transactions in their entirety when the Commission enters an order approving the plan, but such transactions may be consummated in whole or in part prior to that time if the Commission authorizes such consummation by separate order. During the year 1948, American Light shall apply for permission to sell such additional number of shares of Detroit Edison as shall be necessary to enable American Light to complete its investment in the common stock of Michigan-Wisconsin pursuant to clause (i) of this paragraph.
4. All shares of common stock of Detroit Edison not distributed or reserved for distribution as dividends upon the common stock of American Light pursuant to paragraph 2 or sold pursuant to paragraph 3 shall also be disposed of by American Light prior to December 31, 1948. A sufficient number of such shares may be sold to provide funds to meet the reasonably foreseeable needs of American Light and its subsidiaries and such shares of Detroit Edison as may then remain shall be distributed pro rata to the common stockholders of American Light as soon as practicable after expiration of the offer to be made by American Light pursuant to ■paragraph 5. Supplemental applications covering the transactions provided for in this paragraph shall be filed with the Commission.
*602 22. By Memorandum Opinion and Order of November 19, 1947, tlie Commission authorized the sale by American of 450,000 shares of Detroit Edison common stock, stating in part:
The second proposal is to sell promptly 450,000 shares of Detroit Edison stock, out of 1,289,205 shares now owned by American. None of the participants made any specific objection to approving this sale. There is no request at this time for approval of any particular disposition of the proceeds. Testimony of applicants’ witness indicates that the proceeds, which are estimated roughly at $10,000,000, will be added to the cash funds of American, replenishing the expenditure being made for Michigan-Wisconsin stock, and will be held available for use in connection with consummating the plan, if and when it is approved by this Commission. Disposition of the Detroit Edison stock is in accord with our Order of August 5,1941 requiring American to dispose completely of its interest in Detroit Edison and the sale of 450,000 shares, or slightly over one-third of the holdings, at this time is an appropriate step in compliance with our order.
The Commission’s order provided as follows:
further ordered that American Light & Traction Company be and hereby is authorized to dispose through sale, pursuant to the rules of this Commission, of 450,000 shares of common stock of the Detroit Edison Company, jurisdiction being reserved to consider and pass upon the terms and details of such sale, and jurisdiction being further reserved to issue such further orders as may be appropriate to the carrying out of the transaction.
By the Commission.
23. On December 30, 1947, the Commission issued its Opinion and Order approving Application No. 31 as amended. With respect to American’s disposal of its Detroit Edison common stock, the Commission stated:
In 1941 Railways was ordered to dispose of its interest in American and its subsidiary companies, and American was ordered to divest itself of Detroit Edison. That order has become final. The present plan proposes to accomplish those divestments by the end of 1948 and thereafter to separate completely the operations of American from Railways. It also proposes that American will dispose of its interest in Madison.
*603 American will dispose of the 1,418,125 shares of Detroit Edison which it presently owns through sale, by dividends to common stockholders in lieu of cash, and by pro rata distribution to its common stockholders. The sale will be made in three blocks: 450,000 shares in December, 1947; 400,000 shares in May, 1948; and 250,000 shares in October, 1948. A total of 138,796 shares will be distributed in four quarterly dividend distributions, and the balance of 179,329 shares will be distributed to stockholders sometime in December, 1948. Since the proceeds from the sale of this stock are to be used by American to finance its common stock purchases of Michigan-Wisconsin, the number of shares sold as well as the amount remaining for distribution will depend upon the prices received for the stock. The foregoing estimates are based on an assumed net realization of $22 a share.
*****
The foregoing divestments are specifically required by our outstanding order of August 5, 1941. We find that the proposed transactions constitute an appropriate means of complying with Section 11(b) (1), and therefore satisfy the “necessity” standard of Section 11 (e).
The Commission’s order accordingly provided:
IT IS FURTHER ORDERED AND RECITED that the Steps and transactions itemized below involved in the consummation of the plan as amended are necessary or appropriate to the integration or simplification of the holding company system of which American and Railways are members and are necessary or appropriate to effectuate the provisions of Section 11 (b) of the Public Utility Holding Company Act of 1935:
❖ # * # #
(3) the sale and transfer by American from time to time of such number of shares of common stock of Detroit Edison as shall be necessary to enable American to complete its investment in common stocks of Michigan-Wisconsin and Michigan Consolidated as set forth m (2) above and to meet the reasonably foreseeable needs of American and its subsidiaries;
(4) the expenditure by American of the proceeds of sales of common stock of Detroit Edison, or of other funds not in excess of such proceeds, in the purchase of common stocks of Michigan-Wisconsin and Michigan Consolidated, as set forth in (2) above.
*604 (5) the distribution and transfer by American to its common stockholders, as a dividend in kind, of all remaining shares of common stock of Detroit Edison not distributed or reserved for distribution as set forth in (1) above or sold as set forth in (3) above; * * *
24. Acting in compliance with the Commission’s Order of August 5, 1941, and the Opinion and Order of November 19,1947, American, on December 11, 1947, filed an Application in Response to Commission’s Order of November 19, 1947, requesting approval of the sale by American of 450,000 shares of Detroit Edison common stock at competitive bidding and, in order to facilitate the offering of the 450,000 shares, requesting authority to purchase, on the New York and Detroit Exchanges, such number of shares of Detroit Edison stock as might be necessary to stabilize the price of such stock.[3] On December 29, 1947, the Commission issued its order approving the above application.
25. On January 6, 1948, following the opening of bids, American filed with the Commission its Amendment to Application in Response to Commission’s Order of November 19, 1947, in which, after reciting the amounts of the bids received and the proposed application of the proceeds to American, the following statement appears:
Inasmuch as both the sale of the 450,000 shares of Capital Stock of Detroit Edison and the investment of the net cash proceeds of such sale in common stocks of Michigan-Wisconsin and Michigan Consolidated are being consummated pursuant to a plan for compliance with section 11(b) of the Act and prior orders of the Commission thereunder, American Light requests that the Commission include in its order approving such sale and investment the recitals necessary to conform such order to the requirements of Supplement r and section 1808(f) of the Internal Revenue Code.
' On the same date the Commission issued its Supplemental Order Pursuant to Rule u-50 approving the sale. The Commission’s order provided in parts as follows:
*605 it is further ordered that the following transactions are necessary or appropriate to the integration or simplification of the holding company system of which American Light is a member, and are necessary or appropriate to effectuate the provisions of Section 11 (b) of the Act:
1. The sale and transfer by American Light of 450,000 shares of Capital Stock of Detroit Edison at the price of $19.06 per share.
2. The expenditure by American Light of the entire net cash proceeds to be received from the above-mentioned sale of Capital Stock of Detroit Edison, in the amount of $8,577,000, or of other funds not in excess of such proceeds, in the purchase of 45,771 shares of the common stock of Michigan-Wisconsin Pipe Line Company at the par value of $100 per share and 285,714 shares of the common stock of Michigan Consolidated Gas Company at the par value of $14 per share.
Thereafter, on January 9, 1948, American sold said 450,000 shares of Detroit Edison stock to the high bidder, a syndicate represented by The First Boston Corporation, at a price of $19.06 per share, making a total consideration of $8,577,000.
26. Acting in compliance with the Commission’s Order of August 5,1941, and the Order of December 80,1947, American carried out the following transactions:
(a) On March 25, 1948, American filed with the Commission an “Application in Eesponse to Commission’s Order of December 30, 1947,” requesting approval of the sale by American of 450,000 shares of Detroit Edison stock at competitive bidding and also requesting authority to purchase such number of shares of Detroit Edison stock as might be necessary to stabilize the price of such stock. On April 7, 1948, American filed its “First Amendment to Application in Eesponse to Commission’s Order of December 30, 1947.” This amendment stated:
American Light contemplates that the proceeds of the sale of 450,000 shares of Capital Stock of Detroit Edison proposed to be sold may be invested in common stock of Michigan-Wisconsin or used to reimburse the treasury of American Light for funds heretofore so invested, as well as for other foreseeable needs of American Light and its subsidiaries, and therefore requests that this Application be considered as filed in response to the last *606 three lines of paragraph 3 of the Plan as quoted above as well as pursuant to paragraph 4 of the Plan.
On April 12, 1948, the Commission issued its order approving said application. On April 21, 1948, following the opening of bids, American filed its Second Amendment to Application No. 1 in Eesponse to Commission’s Order of December 30, 1947. On the same date, the Commission issued its Supplemental Order Pursuant to Eule xr-50 approving said sale. Thereafter, on April 23, 1948, American sold the 450,000 shares of Detroit Edison common stock to the high bidder, a syndicate represented by Coffin & Burr, Inc., and Spencer, Trask & Co., at a price of $19.73 per share, making a total consideration of $8,878,500.
(b) On June 28, 1948, American filed with the Commission Application No. 2 in Eesponse to the Commission’s Order of December 30,1947, requesting approval of the sale by American of 190,000 shares of Detroit Edison common stock at competitive bidding and also requesting authority to purchase such shares of Detroit Edison stock as might be necessary to stabilize the price of such stock. On August 5,1948, the Commission issued its order approving said application. On August 11, 1948, following the opening of bids, American filed its Third Amendment to Application Number 2 in Eesponse to Commission’s Order of December 30, 1947. On the same date, the Commission issued its Supplemental Order Pursuant to Eule u-50 approving said sale. Thereafter, on August 13,1948, American sold 190,000 shares of Detroit Edison common stock to the high bidder, Blyth & Co., at a price of $20.01 per share, making a total consideration of $3,801,900.
(c) On October 26, 1948, American filed with the Commission Application Number 4 in Eesponse to Commission’s Order of December 30, 1947, requesting approval of the sale by American of 192,734 shares of Detroit Edison common stock at competitive bidding and also requesting authority to purchase such shares of Detroit Edison stock as might be ■necessary to stabilize the price of such stock. On November 9, 1948, the Commission issued its order approving said application. On November 16, 1948, following the opening of bids, American filed its Third Amendment to Application *607 Number 4 in Response to Commission’s Order of December 30,1947. On the same date, the Commission issued its Supplemental Order Pursuant to Rule u-50 approving said sale. Thereafter, on November 18, 1948, American sold 192,734 shares of Detroit Edison common stock to Blyth & Co., the high bidder, at a price of $19,546 per share, making a total consideration of $3,767,178.76.
(d) On December 30, 1948, American sold its remaining one-half share of Detroit Edison common stock for $8.52 and on December 10,1948, sold certain stock rights acquired on November 10, 1948, for $3.64.
(e) During the year 1948, American distributed to its common stockholders, in lieu of cash dividends, a total of 137,091 shares of the common stock of Detroit Edison. Such dividends were paid quarterly on the basis of one share of Detroit Edison common stock for each 75 shares of American common stock. Cash distributions were made in lieu of distribution of fractional shares of Detroit Edison common stock. The distribution dates and number of shares of Detroit Edison stock distributed were as follows:

Shares

February 2, 1948_ 34,554
May 1, 1948_ 34,606
August 2, 1948_34,152
November 1,1948_ 33, 779
(f)Based upon the closing market price of Detroit Edison stock on the New York Stock Exchange the day preceding each of the distributions referred to above, the totaT value of the four dividends paid in common stock of Detroit Edison was $1.13% per share of American common stock. Because American was committed to a dividend payment of $1.20 per share on its common stock for 1948, an additional cash dividend of 6% cents per share was paid on November 1, 1948, to holders of common stock of American.
27. American’s gross proceeds from the sale of its 1,282,-734% shares of Detroit Edison common stock and rights were $25,024,590.92. American’s expenses in connection with said sales totaled $128,498.57, making its net proceeds therefrom $24,896,092.35. Of the 192,734 shares of Detroit Edison common stock sold by American on November 18, 1948, 300 shares, for which American received $5,863.80, had been ac *608 quired as stabilizing purchases on August 12,1948, pursuant to an order of the Commission authorizing such purchases as an aid to the public marketing of the offered shares. The stabilizing shares had thus been held by American for a period of less than 6 months at the time of sale. Accordingly, American’s net proceeds from sales of Detroit Edison common stock held for more than 6 months totaled $24,890,228.55.
28.For the years 1944-1948, inclusive, plaintiffs paid Federal income and excess profits taxes in the following net amounts, including interest:

29. In American’s consolidated Federal income tax return for the calendar year 1948, the cost or other basis of the Detroit Edison common stock sold by American in 1948 is reported to be $41,838,260.02. A capital loss was reported in the return to have resulted from the sale of the Detroit Edison stock in the amount of $16,422,167.67. In the claim for refund filed by American for the calendar year 1948, it is contended by American that the loss as reported on the consolidated return of $16,442,167.67 (less $298.25 which was a short term capital loss) was actually a loss from the compulsory or involuntary conversion of capital assets held for more than 6 months within the meaning of section 117 (j) of the Internal Revenue Code of 1939, and therefore fully deductible as an ordinary loss in computing taxable net income.
30. On the same date, March 14,1952, American also filed claims for refund of income taxes for the calendar years 1946 and 1947 and for refimd of excess profits taxes for the years 1944 and 1945 resulting from adjustments to the consolidated net income of the affiliated group for other taxable years. All such claims for refund were denied by the District Director of Internal Revenue on September 17,1954, to the extent that the claims for refund related to the claims made herein.
31. At the request of counsel for American and Railways, *609 tbe Bureau of Internal Revenue, under date of March 4, 1949, issued a ruling holding that, in accordance with the provisions of section 371(c) of the Internal Revenue Code, no gain would be recognized to the common stockholders of American as a result of the receipt by them of shares of common stock of Detroit Edison distributed by American during 1948. The above ruling also stated as follows:
The cash distributed in lieu of fractional shares of American, Detroit Edison and Madison common stock, and the supplementary cash dividend of per share distributed by American on November 1,1948, is taxable as ordinary dividend income to the extent provided in section 115 (a) of the Code.
32. In plaintiffs’ petition, it is alleged that the Federal income tax basis for the shares of Detroit Edison common stock sold by American was in the total amount of $43,200,-493.94, rather than $41,338,260.02 reported in its 1948 Federal income tax return, thus incurring a net loss of $18,310,265.39, rather than $16,441,869.42, during 1948 on its sales of Detroit Edison common stock held for a period of more than 6 months. The plaintiffs’ claim for an increased basis as set forth in paragraph 25 of the petition is based upon a contention that the identification (or tracing) method of determining the cost of Detroit Edison stock should be used instead of the first-in, first-out method which was actually used in American’s consolidated Federal income tax return for 1948. It is the contention of the defendant that the Court of Claims does not have jurisdiction to consider the question of whether the plaintiffs’ basis of Detroit Edison stock should be increased from $41,338,260.02 to $43,200,493.94, since this matter was not raised in the claim for refund.
No finding is made on the basis for the Detroit Edison stock, based upon the identification (or tracing) method of valuing it, since no such claim was made in the claim for refund.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petition is therefore dismissed.

 If they are, they sustained a net operating loss In 1948, which they will be able to use as a carryback to the preceding taxable years to offset or reduce the Income for those years and, hence, to recover some or all of the taxes previously paid for those years.

 An Integrated public utility system was defined as one which “may be economically operated as a single interconnected and coordinated system confined in its operations to a single area or region, in one or more States, not so large as to impair * * * the advantages of localized management, efficient operation, and the effectiveness of regulation; * *

 The evidence in this case consists of a stipulation of facts and) 56 exhibits. Counsel for the parties further agreed! upon the content of findings 1-11, 13-18, 20, 22, 23, and 27-31. Findings 12, 21, and 24-26, as requested by defendant, were accepted by plaintiffs subject only to minor additions.

 This proceeding was identified as File No. 59 — 11. The Notice andi Order for Hearing is in evidence as Exhibit 1. On December 9, 1949, proceedings under section 11(b)(2) were instituted by the Commission, under File No. 59-17. The Notice and Order for Hearing is in evidence as Exhibit 3. Subsequently, the proceedings in Files Nos. 59-11 and 59-17 were consolidated.

 American expressly agreed tliat shares of Detroit Edison stock purchased for stabilization' purposes would be held subject to the outstanding orders of the Commission and the provisions of Application No. 31, in the same manner as shares of such stock were then held.