**ANA SMALL BUSINESS INVEST-MENTS, INC., Petitioner,**

v.

**SMALL BUSINESS ADMINISTRATION OF the UNITED STATES of America, Respondent.**

**No. 21214.**

United States Court of Appeals Ninth Circuit.

March 12, 1968.

Robert E. Burns (argued), G. Fred Skaff, Peter Levy, San Francisco, Cal., for appellant.

Leonard Schaitman (argued), Alan S. Rosenthal, Department of Justice, Carl Eardley, Acting Asst. Atty. Gen., Jerome Garfinkel, Civil Division, Department of Justice, Philip Ziedman, General Counsel, SBA, Washington, D. C., Earl P. Dolven, SBA, San Francisco, Cal., for appellee.

Before HAMLEY, HAMLIN and JERTBERG, Circuit Judges.

HAMLEY, Circuit Judge:

Proceeding under section 309(e) of the Small Business Investment Act of 1958 (Act), 72 Stat. 689, as amended, 75 Stat. 753 (1961), 15 U.S.C. § 687a(e) (1964), ANA Small Business Investments, Inc. (ANA), appeals from an order of the Small Business Administration (SBA), entered on July 21, 1966.

SBA is an agency of the federal government. On November 20, 1960, it licensed ANA to do business as a small business investment company (SBIC) under the Act. The agency order in question, entered as a result of show cause proceedings instituted by SBA, directed ANA to divest itself of 37,500 shares of Lease-Lite Corporation (Lease-Lite) and eleven percent of the capital stock of Tydeman Machine Works (Tydeman), and relinquish control over two other corporations, Granelli Construction Company, Inc. (Granelli), and R. W. Sperr Co. (Sperr). The order also suspended ANA's license until it complied with the order.[1]

The hearing examiner found that ANA's purchase of the Lease-Lite and Tydeman stocks from individual shareholders, rather than the issuing corporation, was a violation of section 304(a) of the Act, 72 Stat. 693 (1958), as amended, 15 U.S.C. § 684(a) (1964), and SBA's regulation, 13 CFR § 107.501(b). Further, the hearing examiner found that ANA acquired and exercised indefinite control over Lease-Lite, Granelli and Sperr through stock ownership and interlocking directors, thereby violating SBA's regulation, 13 CFR § 107.510.

On November 20, 1960, ANA was licensed by the SBA to do business as an SBIC. Under the Act, an SBIC is authorized to supply equity capital to incorporated small business concerns (§ 304 of Act, 72 Stat. 693 (1958), as amended 15 U.S.C. § 684 (1964)), and make long-term loans to incorporated and unincorporated small business concerns. Section 305 of Act, 72 Stat. 693 (1958), as amended, 15 U.S.C. § 685 (1964).[2] The Act is part of a declared congressional policy to stimulate and supplement the flow of private equity and long-term loan funds to small business concerns (§ 102 of Act, 72 Stat. 689 (1958), 15 U.S.C. § 661 (1964)), and provides that SBIC's shall be incorporated "solely for the purpose of performing the functions and conducting the activities contemplated under this subchapter * * *." Sec-

---

[1] The review proceeding in this court was commenced on August 17, 1966. On October 24, 1966, we stayed SBA's order pending the determination of the petition, but with specified restrictions upon the operations of ANA.

[2] In addition, SBIC's are authorized: (1) to provide consulting and advisory services to small business concerns; and (2) "to invest funds not reasonably needed for their current operations" in direct obligations of, or obligations guaranteed by, the United States, or in savings accounts insured by the Federal Savings and Loan Insurance Corporation. § 308(b) of Act, 72 Stat. 695, as amended, 15 U.S.C. § 687(b) (1964).

tion 301(a) of Act, 75 Stat. 756 (1961), 15 U.S.C. § 681 (1964).

*Lease-Lite and Tydeman Transactions*

On December 29, 1960, ANA purchased fifty percent of the common stock of Lease-Lite (37,500 shares) from Anchor Realty, a partnership owned by two of ANA's directors.[3] ANA's Counsel testified that before the transaction was completed, he informed J. P. Wasserburger, head of the investment division of SBA's regional office in San Francisco, of the details of the transaction, including the parties involved. Mr. Wasserburger gave his personal approval of the transaction, but did not "officially" approve it. However, according to ANA's counsel, the only impropriety discussed was the possible self-dealing between ANA and Anchor Realty.

The Tydeman stock was purchased on May 1, 1961, from two of ANA's directors. The transaction involved eighty shares of common stock and 1,920 shares of preferred stock, the total representing eleven percent of Tydeman's capital stock. About two weeks after the Tydeman sale was consummated, ANA's counsel wrote a letter to Mr. Wasserburger explaining the details of the transaction and expressing his view that no "self-dealing" was involved. Following a conference between ANA's counsel and SBA officials, the regional counsel for the SBA expressed his opinion "that the matters described did not constitute a conflict of interest and were not improper within the intent and purposes of the Small Business Investment Act or the regulations of the SBA promulgated thereunder." ANA's counsel stated that possible violations of section 304(a) of the Act and section 107.501(b) of the regulations were not raised or discussed because "I wasn't aware of it."

Section 304(a) of the Act provides:

"It shall be a function of each small business investment company to provide a source of equity capital for incorporated small business concerns, in such manner and under such terms as the small business investment company may fix in accordance with the regulations of the Administration."

"Equity Capital" is defined by section 107.501(b) of SBA's regulations as:

"funds received by an incorporated small business concern from a Licensee as the consideration for the issuance of Equity Securities by such concern to such Licensee."

The hearing examiner found that, under the described circumstances, the purchase of Lease-Lite shares from Anchor Realty and the purchase of Tydeman shares from ANA's director were violations of section 304(a) of the Act and section 107.501 of the regulations. On the agency appeal, SBA adhered to this view.

ANA does not question the finding that the purchases were made from stockholders, and not the issuing corporation. Nor does it contend that the two small business concerns involved, Lease-Lite and Tydeman, were benefited from the purchases by way of increasing their equity capital or long-term loan funds. Rather, ANA argues, because section 304 only states that "a function" of small business investment companies is to provide equity capital for small business concerns, the Act does not prohibit purchases from individual stockholders.

█ We do not agree. Congress, by providing that SBIC's shall be incorporated "solely for the purpose of performing the functions and conducting the activities contemplated under * * *"

---

**3.** The evidence indicates that Anchor Realty purchased the Lease-Lite stock from Stephen Cohen, a Lease-Lite shareholder, about a month earlier. The evidence also indicates that the purpose of the original transaction between Anchor and Cohen was to advance funds on behalf of ANA, the purchase being subject to the approval of ANA's directors. In any event, whether the purchase be viewed as a purchase by ANA directly from Anchor or indirectly from Cohen, the fact remains that the stock was purchased from an individual shareholder, rather than the small business concern.

the Act (§ 301(a) of Act), intended strictly to limit their activities to those consonant with the purpose of the Act, as noted above opposite footnote reference 2. Here ANA's purchase of Lease-Lite and Tydeman shares from stockholders did not provide equity capital for those small business concerns. Nor was the purchase a reasonably necessary part of the over-all sound financing of such concern.[4] Instead, the purchase resulted in a diversion of ANA's surplus funds beyond that which is permitted by the Act.

ANA further argues, however, that if there was a violation of the Act in this respect, the violation was in good faith and in reliance on the asserted approval given the two transactions by the agency's regional office.

The evidence indicates that the specific question of purchases from an individual shareholder was not raised or discussed and, therefore, did not constitute a construction of the point presently in issue. Masao Hirasuna v. McKenney, 9 Cir., 245 F.2d 98, 104.

But assuming that ANA was misled by the assurances received from SBA's regional office, neither principles of estoppel nor any other equitable consideration entitle ANA to immunity from the statutory and regulatory proscriptions in question. This is made clear by the rule announced in Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10, involving analogous circumstances.

In the *Federal Crop Insurance* case, plaintiff wheat farmers, relying on misinformation by local agents of the Federal Crop Insurance Corporation, insured their crops under the Federal Crop Insurance Act and the Corporation's regulations. When plaintiffs later sued to recover their losses, the Supreme Court denied recovery, holding that the re-seeded crops were not insurable under the Corporation's regulations and the agency was not bound by the misrepresentations of its local officials.

"[T]he Wheat Crop Insurance Regulations were binding on all who sought to come within the Federal Crop Insurance Act, regardless of actual knowledge of what is in the Regulations or of the hardship resulting from innocent ignorance."

332 U.S. at 385, 68 S.Ct. at 3.[5]

■ It need only be added that the informal approvals of the Lease-Lite and Tydeman purchases, however broadly construed, do not have standing as binding administrative constructions of the Act and regulations. The local officials had no authority to issue regulations or formally interpret the Act. See United States v. Stewart, 311 U.S. 60, 70, 61 S.Ct. 102, 85 L.Ed. 40; United States v. Rossi, 9 Cir., 342 F.2d 505, 506–507.

We therefore conclude that SBA did not err in determining that ANA violated section 304(a) of the Act and section 107.501 of the regulations with respect to the Lease-Lite and Tydeman transactions.

*Granelli and Sperr Transactions*

In October 1961, ANA acquired sixty percent (750 shares) of the common stock of Sperr, a newly-formed corporation, for $7,500. Robert W. Sperr, who contributed assets of his prior unincorporated business worth $5,000, received forty percent (500 shares) of the com-

---

4. Under the regulations SBIC's are permitted to purchase from a shareholder, notwithstanding the prohibition of section 107.501, a limited amount of stock "of a portfolio small business concern" if the purchase is "a reasonably necessary part of the overall sound financing of such concern pursuant to the Act." 13 CFR § 107.751(b) (4). As to both the Lease-Lite and Tydeman transactions the hearing examiner found that this exception was inapplicable since they were both initial and total purchases and no necessity of the kind described above had been shown. SBA adhered to this view.

5. ANA appears to have itself recognized the insubstantiality of any "estoppel" defense when, in July-August, 1963, it offered and agreed to divest itself of the Lease-Lite and Tydeman stock within six months.

mon stock. Thereafter, ANA made loans to the corporation totalling $175,239.

In July 1962, ANA purchased eighty percent (2,000 shares) of the outstanding common stock of Granelli, also a newly-formed corporation, for $20,000. Dominic Granelli, who contributed assets of his prior unincorporated business worth $4,000, received twenty percent (500 shares) of the common stock. Thereafter, ANA made loans to Granelli totalling $45,000.

By letters dated November 7, 1962, and December 17, 1962, SBA requested ANA to submit a plan for reducing its equity investment in Sperr and Granelli so that ANA would no longer have control over those small business concerns. By letter dated December 17, 1962, ANA furnished to SBA copies of agreements with shareholders of those concerns designed "for the eventual reduction of our interest in their companies to less than a majority interest with the consequent divestiture of control." However, on February 7, 1966, when the agency issued its show cause order herein, ANA had not relinquished control over either Granelli or Sperr.

The regulation relied upon by SBA with regard to this branch of the case is 13 CFR § 107.510, which became effective on November 15, 1964. It provides, among other things, that a licensee may not acquire equity securities of a small business concern primarily for the purpose of exercising indefinite control over it. Under this regulation, a licensee may acquire temporary control over a small business concern from which it has ac-

quired equity securities or to which it has made long-term loans under stated circumstances.[6]

The hearing examiner found that, contrary to this regulation, ANA has exercised and is exercising long-time effective management control over Granelli and Sperr. The examiner further found that ANA has maintained control of these corporations beyond a reasonable time, as that term is used in section 107.510(e), and is, for that additional reason, in violation of that regulation. The hearing examiner, in his decision of June 16, 1966, directed ANA, within thirty days of the service of the decision, to relinquish its control over Granelli and Sperr. This decision became final, insofar as agency action is concerned, on July 21, 1966, when SBA denied ANA's petition for review.

Pointing out that section 107.510 of the agency's regulations did not become effective until November 15, 1964, ANA argues that the Sperr and Granelli transactions, consummated in October 1961, and July 1961, were in compliance with the law and regulations then in effect.

When consummated, these transactions were not in violation of section 107.510 of the regulations, because that section was not then in effect. Nor were they in violation of any express prohibition stated in the Act. However, the general provisions of the Act, read in the light of its legislative history, indicate that the function of the SBIC's was to finance small business concerns through equity investments and long-term loans and that they were not to operate business enter-

---

**6.** This provision is contained in section 107.510(d) which reads as follows:

"(d) *Temporary control permitted.* A Licensee may acquire temporary control over a small business concern from which it has acquired equity securities or to which it has made long-term loans only where (1) the financing is necessary to rehabilitate such concern which is threatened with insolvency or closure due to financial difficulty; or (2) the financing is provided to a small business concern which has been in existence for less than two years or to an estab-

lished small business which has made substantial changes in its type of operations or products during the preceding two years, and the funds furnished by the Licensee constitute the major source of capital of the small business concern; or (3) assumption of control is reasonably necessary for the protection of Licensee's investment; or (4) SBA's prior approval has been obtained in exceptional circumstances warranting special treatment consonant with the purposes of the Act."

prises or to function as holding companies exercising indefinite control over small business concerns.

Congress found in 1958, after extensive hearings, that existing credit institutions did not provide an adequate supply of equity capital and long-term loans to meet the long-term financing needs of small business concerns.[7] The Act was passed to close this "institutional gap," and to fulfill "the primary purpose of making equity capital and long-term credit more readily available for small business concerns."[8] Throughout the congressional debates in 1958, supporters of the legislation stressed the role of the SBIC program in preserving the independence of small business concerns.[9] The need to maintain the independence of small business concerns was also stressed during the hearings on the legislation.[10]

Consistent with this legislative history, the Act, as originally enacted, while not containing an express prohibition against acquisition of controlling interests, contains provisions which indicate that acquisition of controlling interests would be foreign to the design of Congress. The congressional declaration of policy set out in section 102, 72 Stat. 689 (1958), 15 U.S.C. § 661 (1964), makes it clear that the purpose of the Act is to stimulate and supplement the flow of private equity capital and long-term loan funds which small business concerns need for the sound financing of their business operations and for their growth, expansion and modernization. Nowhere in the Act is the acquisition of indefinite control of such concerns given as an appropriate objective. In sections 304 and 305 of the Act, the functions and activities to be performed by SBIC's are specifically enumerated and again there is no reference to any approved purpose of acquiring control of such concerns. The "convertible debenture" device of section 304 was apparently designed to provide a safeguard against acquisition of indefinite control of a small business concern.[11]

---

7. See H.R.Rep. No. 2060, 85th Cong.2d Sess. 4–5 (1958); S.Rep. No. 1652, 85th Cong.2d Sess. 1–6 (1958), U.S.Code Cong. & Admin.News 1958, p. 3678.

8. S.Rep. No. 1652, 85th Cong.2d Sess. 2 (1958).

9. See the statements of Senator Fulbright, 104 Cong.Rec. 10509 (1958); Congressman Spence, 104 Cong.Rec. 14804 (1958); Congressman Brown, 104 Cong.Rec. 14807 (1958); and Congressman Coad, 104 Cong.Rec. 14819–14820 (1958).

10. See the statements made during the Hearings on S. 2160, S. 2185, S. 2286, S. 3191, S. 3643 and S. 3651 before the Senate Comm. on Banking and Currency, 85th Cong., 2d Sess. April-May, 1958, by Senator Clark (page 187); Senator Proxmire (page 303), Senator Robertson (pages 246, 375), and Senator Sparkman (page 209).

11. See the Hearings on S. 2160, S. 2185, S. 2286, S. 3191, S. 3643 and S. 3651 before the Senate Comm. on Banking and Currency, 85th Cong., 2d Sess., 276, 376 (1958); H.R.Rep. No. 2060, 85th Cong., 2d Sess. 7–8 (1958).
   In order to provide greater flexibility, Congress amended section 304 of the Act in 1960 (74 Stat. 196), to permit SBIC's to supply equity to small business concerns in any form approved by SBA, instead of being restricted to the purchase of convertible debentures, as provided in the original version of section 304. During the 1959 and 1960 congressional hearings on this amendatory legislation, the determination of Congress that the legislation not provide an avenue whereby an SBIC could gain indefinite control of a small business concern was again made evident. While this 1960 legislative history was subsequent to the original enactment, it was prior to ANA's acquisition of controlling interests in Granelli and Sperr.
   In this connection see the statements of Congressman Roosevelt, during the May, 1959, Hearings on the Organization and Operation of the Small Business Administration before the House Select Comm. on Small Business, 86th Cong., 1st Sess. 51; the statement of Congressman Evins during the July, 1959, Hearings on Small Business Amendments of 1959 before the Senate Comm. on Banking and Currency, 86th Cong., 1st Sess. 362–363, 367 (1959); the colloquy between Congressman Patman and Philip McCallum, the SBA's Administrator, during the March, 1960, Hearings on S. 2611 before the House Comm. on

■ It follows that, although section 107.510 of the regulations was not in effect when ANA acquired Granelli and Sperr, those transactions, if regarded as giving ANA indefinite controlling interests in those corporations, were, at the outset, violative of the Act read as a whole. On the other hand, if those transactions are regarded as intended to give ANA control for only a limited period of time for the purpose of making practicable and safeguarding ANA's investment, that intention was defeated when, after the expiration of many months, ANA continued to hold such control. Thus, on either supposition, and even though section 107.510 of the regulations was not yet in effect, SBA was entitled to notify ANA, by its letters of November 7 and December 17, 1962, that ANA should submit a plan for divesting itself of control over Granelli and Sperr.

■ It is true, however, that ANA was not specifically charged with violating the Act, or ignoring the directions contained in the letters of November 7 and December 17, 1962. Instead, it was charged with violating section 107.510 of the regulations. In our view this charge cannot be sustained on the basis of any conduct on the part of ANA occurring before the November 15, 1964 effective date of that regulation. To do so would be to give the regulation impermissible retroactive effect notwithstanding the fact that the regulation was designed to carry out the original objectives of the Act.

■ ■ But, as a licensed SBIC, ANA is subject to the principle that a licensee

under a scheme of federal regulation acquires no vested rights which immunize it from reasonable regulation by an administrative agency. See F.H.A. v. The Darlington, Inc., 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132.[12] Considered in this light, SBA's order of July 21, 1966, requiring ANA to comply with section 107.510 of the regulations, can properly take cognizance of ANA's failure to comply with that regulation since it became effective in November, 1964. So viewed, the agency order does not represent punishment for conduct occurring before November 1964, but only an insistence that, beginning with that date, the regulation be honored. So construing the agency order, no impermissible retroactive application of section 107.510 is involved. See North American Co. v. S.E.C., 327 U.S. 686, 708, n. 15, 66 S.Ct. 785, 90 L.Ed. 945.

ANA contends that the transactions whereby it acquired control of Granelli and Sperr are permissible under paragraph (d) of section 107.510 of the regulations. This paragraph provides, in part, that a licensee may acquire temporary control over a small business concern from which it has acquired equity securities where the financing is provided to a small business concern which has been in existence for less than two years, and the funds furnished by the licensee constitute the major source of capital for the small business concern. See note 6 above. ANA points out that both Granelli and Sperr had been in existence for less than two years prior to the stock acquisitions by ANA and, in the case of

Banking and Currency, 86th Cong., 2d Sess. 24–26; the statement of Senator Proxmire at those same hearings (page 176) ; and the report of the House Comm. on Banking and Currency, issued in May, 1960, dealing with the proposed amendment to section 304 (H.R.Rep. No. 1608, 86th Cong., 2d Sess. 7, U.S.Code Cong. & Admin.News 1960, p. 2340).

12. Under sections 301(c) and 308(c) of the Act (72 Stat. 691, 694 (1958), as amended, 15 U.S.C. §§ 681(c), 687(c) (1964)), SBIC's are licensed by SBA and are expressly made subject to such regula-

tions as SBA may adopt. ANA's articles of incorporation expressly provide that the corporation will operate in the manner and shall have the powers, responsibilities and be subject to the limitations provided by the Act and the regulations issued by SBA thereunder. When ANA was licensed by SBA in November 1960, the latter's regulations provided (§ 107.-308–12, 23 Fed.Reg. 9383 [now 13 CFR § 107.701(a)]): "A licensee shall be subject to all existing and future provisions of the act and regulations issued thereunder."

both companies, ANA was the major source of the capital of those concerns. ANA also calls attention to the fact that the written agreements entered into with Granelli and Sperr contemplated the repurchase of the stock, thus evidencing an intention by ANA to exercise only temporary control.

Paragraph (e) of section 107.510 provides that where control of a small business concern is assumed by a licensee in accordance with paragraph (d), the licensee must negotiate and enter into a plan providing for ultimate relinquishment of such control within a reasonable period of time. The hearing examiner found that ANA has maintained control of Granelli and Sperr beyond a reasonable period and thus is in violation of section 107.510 of the regulations. SBA concurred in that determination.

We think that, on this record, it is a permissible determination. Implicit within the requirement of a plan to divest within a reasonable period of time is a requirement that the plan shall in fact be carried out. Hence, assuming that the original acquisition of control of these companies complied with the standard subsequently established in section 107.510(d), the failure to meet the requirements of section 107.510(e) warrants the agency order directed against the Granelli and Sperr acquisitions.

\* \* \*

While we thus sustain the SBA order under review in all particulars, we also take note of ANA's earnest representation that extreme hardship will be involved if it is to be de-licensed without another opportunity to comply with the agency directive. Accordingly, the proceeding is remanded to SBA to provide ANA another opportunity to present a practicable plan to achieve compliance within a reasonable time. If such a plan is not submitted within a reasonable time, or if submitted is not acceptable to SBA, the stay order heretofore entered by this court shall expire forthwith and the order under review shall become fully effective without further recourse to this court.